## In re LO DOLCE.

### Misc. Cr. 20.

United States District Court
W. D. New York.
Aug. 11, 1952.

Francis Di Bartolo, Buffalo, N. Y., for complainant James Battistoni, as Consular Agent for Republic of Italy.

Fink, McNamee & Pavia, New York City (Thomas J. McNamee, New York City, and Ralph J. Schwarz, Jr., of New York City, as counsel), for Consul General of Italy.

Thomas G. Presutti, Rochester, N. Y., for Carl George LoDolce.

KNIGHT, Chief Judge.

This is a proceeding on application by the government of the Republic of Italy for the extradition of one Carl George LoDolce, also sometimes called "Carlo Giorgio Lo-Dolce", from the United States to Italy on charges of highly pluri-aggravated homicide and robbery.

The facts disclosed in the description of the crimes are so gruesome as to be almost unbelievable were they not supported by the written and oral confessions of LoDolce and the testimony of numerous other individuals.

During World War II, in the fall of 1944, while an American army was fighting a German army in Italy, various allied "missions" were set up to contact the "underground" Italian partisans behind the German lines to assist and direct their movements and to succor them with supplies. In other words the purpose was to combine the efforts of the partisans with the allies.

In October, 1944, LoDolce was assigned to a mission of the United States army called the "Chrysler Mission" which was composed of Captain Victor Giannino, Sergeant Arthur Ciarmicoli and Sergeant LoDolce. All were citizens of the United States and members of its army. The mission was ordered to and did operate in the northern part of Italy behind the German line. Its base was shifted from time to time until it contacted another United States army mission known as the "Mangestine Mission" composed of Major William V. Holohan, who was in command, Lieutenant Aldo Icardi, two Italian citizens one named Landi and the other a radio operator known as "Red". The two missions met at the Villa Castelnuovo, Province of Novaro, in the locality of S. Maurizio d'Opaglio. Shortly thereafter Giannino and Ciarmicoli left the others to go farther north to make contact with different groups of partisans. The remaining members of the two missions stayed and LoDolce continued to operate from Mangestine Mission.

On the evening of December 6, 1944, Major Holohan disappeared and searches failed to disclose what had happened to him. On June 16, 1950, Major Holohan's body was recovered from Orat Laje, a nearby lake. When he disappeared there were present with him at the villa, Captain Icardi, LoDolce and partisans Manini Giuseppe and Tozzini Gualtiero. The testimony and exhibits disclose that Major Holohan was in disfavor with Icardi and LoDolce, especially Icardi. It seems that Icardi was the individual who mainly directed the acts which took place. Manini, at Icardi's direction, procured some potassium cyanide. At the evening meal some of this deadly poison was placed in Holohan's soup and he ate the soup. The Major was evidently made sick from the poison. He went upstairs to his room, returned downstairs, complained of being ill and returned to his bedroom. Fearful that the attempt to poison Holohan might be discovered they decided to kill him. Manini refused to do the killing. Icardi and LoDolce flipped a coin to decide who must do away with Holohan and LoDolce lost. LoDolce took Manini's revolver and with Icardi went to the Major's room where LoDolce shot Holohan twice. The two partisans had followed upstairs so that Icardi, Manini and Tozzini were present at the shooting. Icardi then took a sum of money from the Major's haversack. The dead man, Holohan, was tied up in a bag, carried to a boat wait-

ing at the lake, weighted and thrown into the water. In this lake the body was found.

Icardi was second in command and took over and continued the mission. LoDolce remained with the mission until April, 1946, when he rejoined the American forces. He was discharged from the army the following October and was awarded the Legion of Merit for meritorious service. Without in the least condoning the actions of LoDolce, it is to be said that Icardi was the leader in this atrocious crime. The long record before this Court discloses that there had been hard feelings towards Holohan by Icardi and Icardi had the chance to succeed as Mission leader through Holohan's death.

In this proceeding there is no dispute that Major Holohan was murdered and robbed or that the crimes were committed in Northern Italy behind the German army line. Nor is there dispute that the mentioned crimes are crimes designated in the Treaty of 1868 between the United States of America and the Kingdom of Italy, 15 Stat. 629, for which extradition may be demanded.

■ At the time of the commission of the alleged crimes in 1944, a state of war existed between the United States and Germany. It cannot be disputed that at that time a state of war also existed between the United States and Italy. The military hostilities between the United States and Italy had been suspended by the armistice. As defined by the United States army in its Basic Field Manual, Rules of Land Warfare, Rule 253, "An armistice is not a partial or a temporary peace; it is only the suspension of military operations to the extent agreed upon by the parties". See also Webster's Dict. and Hague Peace Convention, Art. 36. An armistice does not mean a conclusion of war. It is a step intended to lead to a treaty of peace. From time to time following the armistice agreement, steps looking to the removal of many things hampering the Italian people were taken. The duties of the Control Commission, which was established to supervise the terms of the armistice, were gradually lessened until it was largely removed. On September 15, 1947, a treaty of peace between the United States and the Republic of Italy became effective, 47 Stat. 1245.

■ The claim as made by the complainant is that the grant of the directive by the Secretary of State is not a "ministerial act", but an act of discretion, and that "the only conclusion possible is that the State Department has concluded that the accused in the instant case has committed a crime within the jurisdiction of Italy and is not exempt from the judicial jurisdiction of that country". No merit is seen in this claim. In the first place any such conclusion is denied in the instant case by the letters to Congressmen written by the Department of State. Further the practice for extradition is governed by 18 U.S.C.A. § 3184 where the Secretary of State submits the matter for determination by the Court in the first instance. The Court's decision denying extradition is not reviewable, while a decision granting a certificate is. The directive from the Department clearly shows that the function of the Secretary of State in the first instance is to submit the entire matter to the Court. The concluding clause of the directive reads:

"Now, Therefore, to the end that the above-named officers, or any of them, may cause the necessary proceedings to be had, in pursuance of said laws, *in order that the evidence* of the criminality of the said Carl George LoDolce *may be heard and considered,* and if deemed sufficient to sustain the charges, that the same may be certified, together with a copy of all the proceedings, to the Secretary of State * * *." (Emphasis mine.) See In re Lucke, D.C., 20 F.Supp. 658, and cases cited.

As was said in part in letters to the various Congressmen,

"In view of the fact that this Department is charged by law with the duty of reviewing these extradition cases in which an extradition magistrate finds that a proper case for surrender has been made out under the treaty, the Department carefully avoids expressing any views concerning the case prior to its receipt from the extradition magistrate."

■ It is true that where it is clear that the individual sought does not come within the Treaty provisions for extradition, the Department of State may deny extradition without submission to any court or commissioner. Harvard Research Int. Law, Extradition, 29 American Journal Int. Law, supp. 166 et seq. The Department has not waived its right to claim immunity. The case cited by the complainant from Hackworth Digest of International Law, Vol. 4, p. 94, was one in which extradition was denied by the Department because the offense had been committed in the United States and the individual or person sought had been convicted here. The distinction is clear.

Pursuant to the directive in sequence, this Court issued a warrant for the apprehension of Carl George LoDolce; LoDolce was thereupon arrested and brought before this Court; the Italian Government was represented by counsel; LoDolce was represented by counsel; hearing was had, proof was adduced, arguments were made and briefs were filed. The matter was finally submitted on July 1, 1952.

After examination and study of the many valuable briefs together with the cited cases and the exhibits, as well as further independent research, there seems to be one question for determination. The place of the commission of the alleged crimes has been determined and admitted as being in the northern part of Italy many miles behind the enemy line as then held by the German army. We then come to the vital question with respect to the application of the treaty between the United States and the Republic of Italy, effective September 15, 1947, which the demanding government claims revitalized the Extradition Treaty of 1868 and made it retroactive.

The Treaty of Extradition of 1868 between Italy and the United States is still in force. The Treaty of Peace with Italy, effective September 15, 1947, provided that the Allied or Associated Power would notify Italy which of the pre-war bilateral treaties it desired to keep and by note dated February 6, 1948, the Department of State listed the Treaty of 1868 as one which it desired to keep in force. See Treaty of Peace, Article 44. It is believed that this Treaty is retroactive. United States ex rel. Oppenheim v. Hecht, 2 Cir., 16 F.2d 955; In re Di Giacomo, Fed.Cas.No.3,747, 12 Blatchf. 391.

The preamble to the 1868 Extradition Convention reads:

"The United States of America and * * * King of Italy, having judged it expedient * * * that persons convicted of or charged with the crimes hereinafter specified * * * should * * * be reciprocally delivered up, * * *."

Article I, in part, provides that the respective governments:

"mutually agree to deliver up persons who, having been convicted of or charged with the crimes specified * * *."

And Article II, in part, provides:

"Persons shall be delivered up who shall have been convicted of, or be charged, according to the provisions of this convention, with any of the following crimes: * * *."

The crime of murder charged here is one of the crimes included in the Convention.

■■ This is not a criminal proceeding. Greater liberality in the reception of evidence is permitted in this proceeding than in criminal or other civil proceedings. A special statute controls in the admissibility of evidence in extradition proceedings, 18 U.S.C.A. § 3190, which provides that "properly and legally authenticated" papers offered in evidence suffices. Under this provision "hearsay evidence" is permissible. President v. Kelly, D.C., 19 F.Supp. 730; affirmed, 2 Cir., 92 F.2d 605; U. S. ex rel. Klein v. Mulligan, 2 Cir., 50 F.2d 687; Bingham v. Bradley, 241 U.S. 511, 517, 36 S.Ct. 634, 60 L.Ed. 1136.

■ It may be true that the Italian government had not lost to Germany and the United States its sovereignty over the boundaries which it occupied prior to the war, yet while any of the enemy armies were within such boundaries, with or without the consent or permission of Italy's government, such presence may justly be

considered as committing an act of hostility and certain of its rights were given up, ceded, severed or abandoned by that sovereign for the time. The Schooner Exchange v. McFaddon, 7 Cranch 116, 139–140, 3 L.Ed. 287; United States v. Rice, 4 Wheat. 246, 4 L.Ed. 562; Coleman v. Tennessee, 97 U.S. 509, 515, 517, 24 L.Ed. 1118.

The opinion of Mr. Justice Field in Coleman v. Tennessee, 97 U.S. 509, 24 L.Ed. 1118, cited and discussed by both petitioner and respondent, must be considered. Since the decision in the Coleman case, it seems to be necessary to read, re-read and study that opinion before a determination is made of any extradition matter. The opinion is far-reaching and is filled with carefully and thoughtfully expressed words and sentences which have been put in such clear, unmistakable and simple language that the exact meaning cannot be confused. The opinion long since has been and still is a basic part of the military law and rules. To emphasize the particular point at hand for the moment, quotation from the opinion will be made, but, the opinion should be considered as a whole to learn the solid foundation for the applicable quoted excerpts.

In Coleman v. Tennessee, supra, Coleman was a regular soldier in the military service of the United States. He was a member of the Union army occupying the State of Tennessee during the war between the states. He was charged with the murder of one Mourning Ann Bell while a member of the army of occupation in Tennessee. He had been tried by general court martial. Later he was indicted for the same crime in the District Court of Knoxville, Tennessee. The Supreme Court, by its decision, required the prisoner to be discharged from the custody of the sheriff and to be delivered up to the military authorities. In his opinion Mr. Justice Field wrote:

"When the armies of the United States were in the territory of insurgent States, banded together in hostility to the national government and making war against it, in other words when the armies of the United States were in the enemy's country, the military tribunals mentioned (court martials) had, under the laws of war, and the authority conferred by the section named (12 Stat. 736), exclusive jurisdiction to try and punish offences of every grade committed by persons in the military service. Officers and soldiers of the armies of the Union were not subject during the war to the laws of the enemy, or amenable to his tribunals for offences committed by them. They were answerable only to their own government, and only by its laws, as enforced by its armies, could they be punished.

"It is well settled that a foreign army permitted to march through a friendly country, or to be stationed in it, by permission of its government or sovereign, is exempt from the civil and criminal jurisdiction of the place. * * * The fact that war is waged between two countries negatives the possibility of jurisdiction being exercised by the tribunals of the one country over persons engaged in the military service of the other for offences committed while in such service. Aside from this want of jurisdiction, there would be something incongruous and absurd in permitting an officer or soldier of an invading army to be tried by his enemy, whose country he had invaded."

Mr. Justice Field also delivered the opinion of the Court in Dow v. Johnson, 100 U.S. 158, 25 L.Ed. 632, which has become a part of the military law. In considering the effect on the invading army and the relation of local tribunals due to temporary occupation, and occupation of any portion of the enemy's country, he wrote, at page 166 of 100 U.S., 25 L.Ed. 632:

"They (the municipal laws) are considered as continuing, unless suspended or superceded by the occupying belligerent. But their continued enforcement is not for the protection or control of the army, or its officers or soldiers. These remain subject to the laws of war, and are responsible for their conduct only to their own government,

460

and the tribunals by which those laws are administered. If guilty of wanton cruelty to persons, or of unnecessary spoliation of property, or of other acts not authorized by the laws of war, they may be tried and punished by the military tribunals. They are amenable to no other tribunal, except that of public opinion, which, it is to be hoped, will always brand with infamy all who authorize or sanction acts of cruelty and oppression."

In Hamilton v. McClaughry, 10 Cir., 136 F. 445, also a component part of the military law, a soldier of the United States army ordered to be and stationed at Camp Reilly, Pekin, China, during the "Boxer Uprising" in China, shot and killed a corporal of his regiment. The soldier was tried and convicted of the crime of murder by general court martial and sentenced to be dishonorably discharged with forfeiture of pay and allowances due, and to be confined at hard labor for life. Attack was made upon the jurisdiction of the court martial by petition to the Circuit Court of Kansas. The Court said, at page 448 of 136 F.:

"As shown by the record, during the military occupation of China by the troops of this government, no less than 271 trials by general court-martial were had, which resulted in 244 convictions. Under the well-settled principles of law the offenders so tried were not amenable to the laws of the government of China, and the offenses by them committed, if any, whether by the laws of this country denominated as the crime of murder, robbery, larceny, or other felony, were not committed in violation of any law of China, because done by persons in the military service of this country while stationed in China."

After reference and quotation from the opinions in Coleman v. Tennessee, supra, and Dow v. Johnson, supra, the Court continued at page 449 of 136 F. in the opinion in the Hamilton case:

"It therefore must follow, of necessity, if any punishment shall be meted out for the many crimes committed by persons in the military service of the United States during the occupation of China, such punishment must be imposed under the fifty-eighth article of war (now articles 92 and 93) or the offender go unpunished; and this is true, whether the military occupation of China by the forces of this government was by or against the consent of the government of China. That is to say, if the homicide committed is an offense at all, it was an offense committed in violation of the military laws of this country, transplanted to China, under the authority of the military department of this government, for the government of our military forces while there engaged in operations against the 'Boxer Uprising,' and for the protection of the citizens and representatives of this government and their property."

 It is also well settled that the existence of a condition of war must be determined by the political department of the government; that the Courts take judicial notice of such determination and are bound thereby. War between the United States, and Italy and Germany was declared on December 11, 1941. The armistice between the United States and Italy was agreed upon September 8, 1943. Italy declared war against Germany effective October 13, 1943. The German forces in Italy surrendered May 21, 1945. The peace treaty between the United States and Italy became effective September 15, 1947. It is not disputed that the alleged crimes upon which this proceeding is based were committed December 6, 1944, at a place in northern Italy then occupied by the German armies, the common enemy of the United States and of Italy; nor that the demanding government was not then, with its armies or otherwise, physically in control of the place of the crime.

This Court feels constrained to follow the established precedents. In doing so it is necessary to determine that the treaty between the United States and Republic of Italy is not applicable to the present matter; that the treaty cannot be extended to permit the issuance of a certificate to the Secretary of State that a warrant may issue upon the requisition of the proper authorities of the

Italian government for the surrender of Carl George LoDolce for extradition to Italy for trial by the courts of Italy for the crimes of murder and robbery.

So ordered.