**Vincenzo GALLINA, Relator**

v.

**Donald FRASER, United States Marshal, Respondent.**

**Civ. No. 7511.**

United States District Court
D. Connecticut.
May 15, 1959.

George A. Athanson, Hartford, Conn., for petitioner.

Harry W. Hultgren, Jr., U. S. Atty., Hartford, Conn., Vincent J. Scamparino, Middletown, Conn., for respondent.

J. JOSEPH SMITH, Chief Judge.

In 1958, acting pursuant to the terms of the Convention of 1868 (15 Stat. 629) as amended by the Supplementary Convention of 1885 (24 Stat. 1001), concerning the extradition of fugitive criminals between Italy and the United States, the Republic of Italy requested the Secretary of State of the United States to secure the preliminary arrest of one Vincenzo Gallina, with a view to his extradition. On June 6, 1958, the Secretary of State issue a certificate authorizing the arrest of Gallina and the institution of extradition proceedings against him as provided by law. 18 U.S.C. § 3184. The United

States Commissioner for the District of Connecticut, duly authorized as a Commissioner under the extradition statute by this Court, after receiving a complaint from the Consular Agent of the Republic of Italy in and for the State of Connecticut on June 26, 1958, issued a warrant for the arrest of Gallina pursuant to Section 3184, in order that a hearing of evidence of the criminality of Gallina might be held. Gallina was taken into custody by the United States Marshal. Hearings were held on July 21, July 29, August 4, August 13, August 14, September 8, and September 30, 1958. Gallina was represented by appointed counsel at these hearings and personally attended all those at which evidence was adduced. After hearing and considering all the evidence, the Commissioner found that the Vincenzo Gallina appearing before him was the same Vincenzo Gallina whose extradition was sought by the Republic of Italy, that the offenses charged, to wit, several acts of robbery, constituted extraditable crimes under the Convention of 1868, and that the evidence was sufficient to sustain the charge under the provisions of that Convention. Accordingly the Commissioner ordered the United States Marshal to commit the accused into custody to await the issuance of a warrant by the Secretary of State upon the requisition of the Republic of Italy.

On October 2, 1958 Gallina applied for a writ of habeas corpus. Benedict M. Holden, Jr., United States Commissioner, Donald Fraser, United States Marshal, and Alberto Cupelli, Consular Agent for the Republic of Italy, were named therein as respondents. At the same time relator also made a motion for a temporary injunction to be directed to the same three officials, enjoining them from taking any steps toward surrendering relator to the Republic of Italy or from certifying the proceedings before the Commissioner to the Secretary of State as provided in 18 U.S.C. § 3184, and directing the Commissioner to produce the entire record of the hearing before him. A temporary restraining order was granted on the terms requested, except that Commissioner Holden was directed to file with the District Court only so much of the record of the hearing as he then had in his possession or control. The original record had already been sent to the Department of State. An order permitting relator to proceed in forma pauperis and appointing counsel was issued, appointed counsel being the same attorney who represented relator during the extradition hearing. An order to show cause why the writ of habeas corpus should not be granted was also issued. A hearing on this order and the returns thereto was held on October 9, 1958. At that time relator's motion for a temporary injunction was denied. The court also dismissed the petition insofar as respondents Holden and Cupelli were concerned, inasmuch as the actual detention was maintained by Marshal Fraser alone. On October 15, 1958, the court dismissed without prejudice relator's petition on the ground that the writ was unavailable to him until a final, adverse decision of the Secretary of State was handed down, i. e., until he had exhausted his administrative remedy. A certificate of probable cause for appeal was issued that same day by order of the court. Notice of appeal was filed on behalf of relator on October 29, 1958, and in due course the case was docketed in the Court of Appeals. On February 5, 1959, by stipulation between counsel for relator, the Republic of Italy, and the United States Marshal, and with the approval of Chief Judge Clark, the appeal was withdrawn from the Court of Appeals, and the record was returned to the District Court. At a hearing on March 10, 1959, a joint motion to reopen the judgment of dismissal was presented to the court. In view of the fact that no administrative action had apparently been taken by the State Department since the certification of the record to the Secretary of State by the Commissioner during the previous September, it was thought that the prolonged delay and continued incarceration of relator warranted judicial intervention. Accordingly the motion to reopen

was granted. The record of the extradition hearing, including documentary evidence of proceedings, warrants, depositions, and other records of various Italian tribunals and officers which had been certified by the U. S. Ambassador pursuant to 18 U.S.C. § 3190 for use in said hearings, was returned by the State Department to this court on March 16, 1959. The court has thus had before it all the evidence on which the Commissioner based his finding.

At the outset we deem it to be of paramount importance to keep in mind the scope of the inquiry available to this court in this habeas corpus proceeding. As long ago as 1896 the Supreme Court of the United States declared:

"By repeated decisions of this court it is settled that a writ of habeas corpus cannot perform the office of a writ of error, and that, in extradition proceedings, if the committing magistrate has jurisdiction of the subject-matter and of the accused, and the offense charged is within the terms of the treaty of extradition, and the magistrate, in arriving at a decision to hold the accused, has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition, such decision cannot be reviewed on habeas corpus. * * * Whether an extraditable crime has been committed is a question of mixed law and fact, but chiefly of fact, and *the judgment of the magistrate, rendered in good faith on legal evidence that the accused is guilty of the act charged, and that it constitutes an extraditable crime, cannot be reviewed on the weight of the evidence, and is final for the purposes of the preliminary examination, unless palpably erroneous* in law." (Emphasis supplied). Ornelas v. Ruiz, 1896, 161 U.S. 502, 508–509, 16 S.Ct. 689, 691, 40 L.Ed. 787.

In other words, if after examination of the proceedings before the Commissioner this court is satisfied:

(1) that the Commissioner was duly authorized to issue the warrant for relator's arrest and conduct a hearing pursuant to Section 3184,

(2) that the Commissioner had jurisdiction over the person of the relator,

(3) that the extradition to the demanding nation was requested pursuant to a treaty of extradition then in force between the demanding nation and the United States,

(4) that the offenses of which the relator was charged were within the terms of such a treaty and not excluded from its operation by any exceptions expressed therein,

(5) that there was competent, legal evidence of the criminality of the relator presented to the Commissioner on which to base his decision to commit relator, and

(6) that the Commissioner committed no error of law prejudicial to the rights of the relator,

then the petition for a writ of habeas corpus must be dismissed.

There is no question here as to the authority of the Commissioner, or as to the fact of jurisdiction over the person. However, as we understand relator's position here, serious questions arise under the third, fourth, fifth, and sixth conditions enumerated above. The alleged illegality of the detention of relator is posited on a number of premises:

(1) That no valid treaty exists between the United States of America and the Republic of Italy because the extradition convention of 1868 was abrogated by World War II;

(2) Alternatively, that at the time the offenses were committed, in 1945 and 1946, the convention of 1868 was suspended and cannot be retroactively applied to a war period;

(3) That the relator was convicted *in absentia* and sentenced to two prison terms, and thus will be extradited direct-

ly into prison without a trial; this is said to be contrary to the intended purpose of the 1868 convention and a denial of due process of law;

(4) That the sentence imposed upon relator for one of the convictions by the Italian court pertains indeterminably to both extraditable and non-extraditable offenses, and to allow his extradition under these circumstances would violate the terms of the treaty or convention;

(5) That the offenses of relator are non-extraditable under the convention because they are "political" in character and thus exempted by Article III of that agreement, and

(6) That the refusal of the United States Commissioner to order the subpoena of certain witnesses for the relator, as provided for in 18 U.S.C. § 3191, was substantial error, a denial of due process, and infringed the treaty of 1868.

Before proceeding to a discussion of those matters which are controverted by the parties, we shall set forth those matters as to which there appears to be no controversy as we understand the record and arguments presented to us.

Relator, Vincenzo Gallina, was born in New York, N. Y. on March 27, 1927 and is, prima facie at least, a citizen of the United States by birth. When he was three years old, his parents returned to Italy, whence they had come, relator with them, and remained there permanently, in the town of Resuttano on the island of Sicily. Relator resided in Italy, in or near the town of Resuttano, Sicily until at least some time in 1946 when he became a fugitive from justice. In 1955 he entered the United States, presumably as a stowaway. At no time has there been any dispute as to identity here, relator fully and freely admitting that he is the person sought by the Italian government. Nor has there been any dispute as to the fact that relator fully and freely participated in the several acts which occurred in 1945 and 1946 and which the Italian government describes as acts of robbery, extraditable under the treaty.

The evidence before the Commissioner consisted of both documentary evidence and the testimony of various witnesses. The documentary evidence was admitted pursuant to 18 U.S.C. § 3190, as the documents were properly and legally authenticated so as to be received as evidence in Italian tribunals, which fact was certified by the United States Ambassador to Italy, James D. Zellerbach. The documents were of various types and were submitted in both the original Italian and English translations. In view of relator's admission before the Commissioner that he participated in the events set out in these documents, there is no apparent need for stating in detail what they contained. It is fair to say that this evidence established the following facts.

In mid-October, 1945, relator, together with four companions, accosted a group of laborers who were working in the Resuttano area. Relator and his associates were armed with rifles. A shot was fired to intimidate the laborers and to force them to accede to the demands of the five that they hand over various articles of property. The armed men left the scene after taking two rifles, a pistol, a watch and 5,000 lire from the laborers.

Several days later, the same armed men went to another area of Resuttano where they forcibly obtained 50,000 lire from a farmer who had to borrow that amount from a neighbor to meet the demands of relator and his companions. Prior to this, relator had fired a shot through the door of the farmer's house, wounding his son. The armed men then forced the neighbor who had loaned the 50,000 lire to give them 20,000 lire. At another nearby house they forced the occupant to deliver up 9,000 lire, two loaves of bread, and some cheese.

In the latter part of that same month, October, 1945, relator and two companions, armed with rifles, went to the home of a person named Trobria and demanded 10,000 lire. When the occupants insisted they lacked such funds, the three took in its stead a man's suit, a pair of pants, three shirts, one coat, a pair of lady's shoes, some leather, and a rifle.

On March 17, 1946, relator, armed with a rifle and a pistol, forced one Eugenio Rodano to hand over to him a mare. When this was done, relator rode away.

The facts thus developed are set out in the official documents submitted by the Republic of Italy; much of the detail is supplied by various statements given by relator's associates in these acts after their capture by the Italian police and by the complaining witnesses. As previously noted relator has not denied participation. However, at the hearing he did strenuously controvert certain of the statements made by the other principals, relative to what the members of the gang did with the articles and money they received. According to the statements of several of relator's accomplices, on the occasion of the first three events described above (those in October, 1945), after each flight from the scene the participants divided the booty equally among themselves. Relator denies this and insists that in carrying out the alleged robberies he and the others were acting under the orders of a superior, as members of an organized separatist movement in Sicily whose avowed aim was the political one of obtaining independence from Italian rule for Sicily. The superior relator identifies as one Marciano Torrese; the raids relator states were necessary to obtain funds, weapons, and other supplies needed to bring about the eventual success of the revolutionary, separatist movement. The booty thus obtained, according to relator, was turned over to Torrese or one of his agents. With reference to the alleged theft of the mare in 1946, relator testified that he only "borrowed" it from Rodano temporarily because Torrese needed horses to carry out his separatist activities in the mountains of Sicily. Relator further testified that Torrese, his immediate superior, was working under one Salvatore Guiliano, described as a leader of the Sicilian separatist movement.

After these events, relator successfully eluded capture by the Italian authorities and eventually slipped out of Italy. On May 30, 1949, in the Court of Assizes of Caltanisetta, relator was convicted *in absentia* of the crimes of "Continuous and aggravated" robbery, extortion, and infliction of serious bodily injuries and sentenced to a total of 16 years, 10 months of imprisonment and a fine of 29,000 lire plus costs. Of this total, the robbery charge was accorded a sentence of 7 years, 4 months, and a fine of 17,000 lire. At this same trial four of relator's associates were also tried and convicted. Relator's conviction was appealed to the Court of Assizes of Palermo. On September 15, 1952, that court confirmed the sentence of the trial court. On May 7, 1951, after another trial *in absentia*, relator was convicted of the robbery of the mare in 1946 and sentenced to a term of eight years, ten months, and twenty days of imprisonment, and fined 16,000 lire plus costs. Relator, though absent, was apparently represented by counsel at this latter trial. Whether he was so represented at the former trial does not appear from the Italian record. In the extradition proceeding the Republic of Italy relied only on the charges of robbery, not on the charges of extortion and infliction of serious bodily injuries which are not extraditable under the treaty.

We turn now to a consideration of the specific points raised by the relator.

## I. *Existence of a valid treaty of extradition.*

As stated, the agreement between Italy and the United States under which extradition is sought is the Convention of 1868 (15 Stat. 629), as amended by the Supplementary Convention of 1885 (24 Stat. 1001). It is relator's contention that as a result of the state of war that existed between the United States and Italy from December 11, 1941 until the proclaiming of a treaty of peace on September 15, 1947, the convention or treaty for the extradition of criminals was abrogated.

There can be no doubt that in the absence of a valid treaty of extradition with the demanding government,

extradition will not be allowed. 18 U.S. C. § 3181; Valentine v. United States ex rel. Neidecker, 1936, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5.

This is not the first time since the conclusion of World War II that a court has been asked to decide whether the Convention of 1868, as amended, is presently in force. The Court of Appeals for the Sixth Circuit dealt with this issue in 1957 and gave an affirmative answer. Argento v. Horn, 6 Cir., 1957, 241 F.2d 258. The arguments asserted there, both pro and con, are much the same as those submitted here.

Article 44 of the Multilateral Treaty of Peace with Italy, to which the United States was a party, and which became effective between the two nations as of September 15, 1947, provided, in essence, that each allied power which was a party thereto would notify Italy within six months of the effective date of that treaty which of its pre-war bilateral treaties with Italy it desired to keep in force or revive. All such treaties not so notified were to be considered abrogated. As required by Article II, Section 2, Clause 2 of the United States Constitution, this peace treaty was ratified by the President with the advice and consent of the Senate; ratification had been advised by the Senate on June 5, 1947, and ratification by the President had followed on June 14, 1947, with the proclamation on September 15, 1947. (61 Stat. 1245). On February 6, 1948, the Secretary of State of the United States, pursuant to Article 44 of the Treaty of Peace, notified the Italian government that the United States wished to keep in force or revive certain treaties and agreements covering twelve broad areas of intergovernmental relations, including extradition. The Extradition Convention of 1868 and two subsequent amending agreements were specifically listed among the eighteen treaties, conventions, and agreements designated as kept in force or revived. At no time was this notification submitted to the Senate for its approval.

■ It is now settled that the outbreak of war does not necessarily suspend or abrogate treaties or treaty provisions. Clark v. Allen, 1947, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633. But there is considerably less unanimity of opinion where particular treaties or their provisions are involved. See 87 C.J.S. Treaties § 10c, pp. 933–935.

■■ In the Argento case, the Sixth Circuit Court of Appeals, in an opinion by Judge (now Mr. Justice) Stewart, decided that the Convention of 1868, as amended, was not abrogated by World War II, but merely suspended, therefore its subsequent revival according to the terms of the peace treaty was in fact accomplished by notification despite the lack of Senate approval of the specific agreements to be revived. The court is of the opinion that the Argento case was correctly decided and controls the issue presented in this case. Relator contends that the Argento decision is erroneous because (the argument goes) the court based its decision "solely on the ground that the Political Department determines if a treaty remains in existence and consequently survives the war * * *. This ignores the fundamental distinction between a treaty's remaining in existence and its re-establishment." Apparently relator's position is that the question of a treaty's abrogation or suspension as a result of war is to be decided from the intrinsic nature of the treaty and the compatability, or lack of it, which that intrinsic nature has with a state of war, without looking to the conduct of the political departments of the two nations with regard to the particular treaty. This argument, plausible at first blush, on analysis seems to lack substance based on the realities of international political relations. Oftentimes the intrinsic nature of an agreement made by the political department of one government with that of another nation is revealed only by subsequent conduct and relations between those political departments, for the nature lies not in the bare words of the treaty but in the gloss put on those words by the authorities bound thereto. Our courts have always acknowledged the pre-eminent role of the

political departments in interpreting the obligations of this nation or a contracting nation under a treaty or other type of international agreement. Charlton v. Kelly, 1913, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274; Terlinden v. Ames, 1902, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534. Granting that some treaties, or parts of treaties, are of their very nature so incompatible with a state of war that they must fall with the commencement of hostilities, Karnuth v. United States ex rel. Albro, 1929, 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677 (treaty provision respecting free passage across international boundary line between United States and Canada by nationals of both countries held abrogated by War of 1812), that is not true of an agreement such as that which concerns us here. We are concerned here with an agreement in which no possibilities for mischief are implicit. The two nations are several thousand miles apart, separated by a great ocean. While extradition during the continuance of a state of war is obviously out of the question, we think that a treaty such as this becomes merely inoperative during war, not null and void. In so concluding, we do not rely "solely" on the conduct and opinion of the political departments of our government, nor do we think the Court of Appeals did so in the Argento case; we merely give that conduct and opinion the weight it deserves in this sphere. Charlton v. Kelly, supra.

## II. Retroactive application of treaty to crimes committed during time of war.

Relator contends that even if the treaty was merely suspended from December 11, 1941 until September 15, 1947 as a result of the state of war then in existence between Italy and the United States, extradition under the revived treaty is not available in the present case because the crimes for which extradition is sought were committed while the state of war existed and the treaty was suspended. The point attempted to be made here is evidently that since Italy could not extradite relator during the period of suspension of the Convention of 1868,

such extradition ought not to be allowed after revival for crimes committed during that period.

The status of relations between the demanding nation and the asylum nation at the time of the commission of the offense for which extradition is sought has never been deemed so critical, as we read the cases bearing on this issue; rather it is the status at the time of the demand that is determinative of whether or not extradition will be allowed. United States ex rel. Oppenheim v. Hecht, 2 Cir., 1927, 16 F.2d 955. It appears to have been established long ago that extradition treaties, unless they contain a clause to the contrary, cover offenses committed prior to their conclusion. 4 Moore, Digest of International Law (1906), § 589, p. 269, citing In re De Giacomo, Fed.Cas. No. 3,747, 12 Blatchf. 391. If a person can be extradited for offenses against the demanding government committed prior to the existence of any treaty of extradition, the conclusion is inescapable that where the offenses were committed during a period of suspension only (as opposed to non-existence), extradition will be allowed when the treaty is revived. Essential to the demanding government's claim of extradition is a showing that the acts referred to in the request were offenses against that government when committed, i. e., that the acts were committed in an area over which the civil authority and jurisdiction of that government were established, or in other words, where its sovereignty prevailed. In re LoDolce, D.C. W.D.N.Y.1952, 106 F.Supp. 455. The evidence before the Commissioner established beyond question that the civil administration of the island of Sicily, where the crimes were committed, and other areas of Southern Italy had been restored to the Italian government in 1943, several years before the date of the offenses. In fact the offenses were committed some time after hostilities had ceased elsewhere in Italy, and at a time when the state of war between Italy and the United States had a merely technical existence. The LoDolce case, relied on

by relator, does not lend any support to his present contention. Not only was the area where the offenses were committed by this relator restored to Italian control, unlike that in LoDolce's case, but Gallina, unlike LoDolce, was not a person in the military service of an invading nation at the time of the offenses. The cases are completely distinguishable. The Convention of 1868 does apply, and extradition for the offenses charged may be had according to its terms, unless other considerations advanced by relator prevent it.

III. Extradition after conviction and sentence *in absentia* as violative of due process and the Convention of 1868.

Nothing in the language of the Convention of 1868, or any of the amending agreements, compels the conclusion that the extradition of relator is contrary to the provisions of that agreement. Article I begins:

"The government of the United States and the government of Italy mutually agree to deliver up persons who, *having been convicted of* or charged with the crimes specified * * *" (15 Stat. 629) (Emphasis supplied).

Article II states:

"Persons shall be delivered up *who shall have been convicted of,* or be charged, according to the provisions of this convention, with the following crimes: * * *" (15 Stat. 630) (Emphasis supplied).

Article III states:

"The provisions of this treaty shall not apply to any crime or offence of a political character, and the person or persons delivered up for the crimes enumerated in the preceding article shall in no case be tried for any ordinary crime, committed previously to that for which his or their surrender is asked." (15 Stat. 631.)

■ Relator contends that this language, particularly that of Article III, indicates that the treaty contemplates the extradition of two types of persons only,

1st, the person who is caught, tried, convicted and then escapes, fleeing to the asylum country, and

2nd, the person who flees before he is caught and whose extradition is sought for purposes of trial.

If this were true, obviously extradition of a third type, a person who flees after the offense, avoiding capture, but who is tried and convicted *in absentia,* then escapes to the asylum country, would not be possible. But we think that the language of the treaty is not to be given so restrictive an interpretation, nor has it received such an interpretation in the past.

In Ex parte Fudera, C.C.S.D.N.Y.1908, 162 F. 591, a habeas corpus proceeding, the very treaty now in question was asserted as the basis of a request for extradition of the petitioner. From a reading of the case it seems clear that the person who had committed the crime had been convicted *in contumacium* (in his absence) by the Italian government. Yet the court expressed not the slightest doubt that extradition would have been granted under these circumstances had sufficient evidence of the criminality of the petitioner been presented to it. The fact that petitioner was discharged from custody was due to the lack of competent evidence that the crime charged had been committed.

In Ex parte La Mantia, D.C.S.D.N.Y. 1913, 206 F. 330, again involving extradition under this same treaty, the court said that it made no difference whether there was a conviction *in contumacium;* insofar as the hearing on the criminality of the accused was concerned, he was to be regarded as only charged with the crime. Although in that case the accused was discharged for lack of competent evidence of identity there can be no doubt that had such evidence been produced the court would have ordered the accused held for extradition despite the fact that he had already been tried for the offense and would, in all probability,

be incarcerated immediately upon his return to Italy.

 In our view, this is contrary to neither the treaty nor to an accused's rights under the due process clause of the Fifth Amendment, nor any other constitutional protection traditionally offered to an accused in this country. Regardless of what constitutional protections are given to persons held *for trial* in the courts of the United States or of the constituent states thereof, those protections cannot be claimed by an accused whose trial and conviction have been held or are to be held under the laws of another nation, acting according to its traditional processes and within the scope of its authority and jurisdiction. Insofar as the hearing on evidence of criminality is concerned, it is not a trial. Even so, that hearing must meet the standards of due process. Whether the hearing received by relator in the instant case was consistent with due process will be discussed later in connection with another of his contentions. For the present we hold that extradition of a person convicted *in contumacium* is not contrary to due process of law even where it appears that the extradition will not be followed by a new trial, but rather by immediate incarceration for the offense charged upon a sentence previously imposed, so long as there is sufficient evidence of criminality to justify extradition in the first place under the statutory and treaty provisions regulating same.

IV. Extradition of Relator as violative of the Convention of 1868 due to the nature of the sentence imposed by Italy.

 The documents offered by the Republic of Italy clearly indicate that relator presently would be subject to two sentences should he voluntarily return to Italy, the first being a sentence of 16 years, ten months in prison and a fine of 29,000 lire for the crimes of "aggravated robbery, extortion, and serious bodily injuries," the second being a sentence of eight years, ten months, and twenty days and a fine of 16,000 lire for another crime

of "aggravated robbery." It is recognized by the Republic of Italy that extortion and infliction of serious bodily injuries are not extraditable crimes. Therefore it would seem that so much of the first sentence as applies to those crimes could not be imposed upon relator by Italy should he be involuntarily returned thereto. The Republic of Italy concedes as much on its brief, stating:

> "Relator, if he is surrendered, can only be tried in Italy or ultimately serve that portion of the sentence imposed upon him for the offenses which are extraditable."

On this basis, relator, upon extradition to Italy, would be subject to two sentences, the first being a sentence of seven years, four months, and a fine of 17,000 lire, which the Italian record indicates was the sentence imposed on the count charging the October 1945 robberies, and the second being for eight years, ten months, twenty days, and a fine of 16,000 lire, both imposed upon separate convictions. Whether service of these sentences would be concurrent or consecutive does not appear.

In the Convention of 1868, Article II, Section 4, the crime of robbery is defined as "the action of feloniously and forcibly taking from the person of another goods or money, by violence or putting him in fear."

 There is ample evidence in the record that the acts participated in by relator were within that definition. It is true that the Italian record employs terms which translate into English as "continuous", "reiterated", and "aggravated" in connection with the offense of robbery, but an examination of the record establishes that these words describe circumstances surrounding a robbery or series of robberies, which circumstances, under Italian law, indicate the nature and type and extent of the penalty to be inflicted, rather than the nature of the crime itself. It is also clear that the reference in the Italian record to a charge of "attempted" robbery against relator indicates nothing more than that it was

to be considered just another circumstance of the crime of aggravated robbery, of which relator was ultimately convicted. The offense of aggravated robbery as encompassed in the Italian Penal Code, translated sections of which are in the record, is extraditable under the treaty.

We reiterate that relator, if extradited, is not to serve any part of the sentences imposed for non-extraditable crimes. Relator contends that Italy has already manifested an intent to imprison him for both types of crimes, and that the Italian record shows this because warrants of incarceration are contained therein which specify a term of imprisonment under the first sentence of the full sixteen years, ten months. Although such warrants apparently would have been good authority for relator's imprisonment for the full term had he been taken by the Italian authorities in a place subject to their jurisdiction, the situation has now changed. It seems to us that under the Convention of 1868 and the laws of the United States, the Secretary of State of the United States would not authorize the surrender of a fugitive to the Italian government to be punished for non-extraditable crimes, and that any extradition would be so conditioned as to negate this possibility. It is the settled rule in the United States that an extradited offender can be punished only for the crime charged in the extradition proceedings and no other. Johnson v. Browne, 1907, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816. That rule, besides being in harmony with our traditional concepts of fairness, is based upon principles of international comity and good faith. United States v. Rauscher, 1886, 119 U.S. 407, 414–419, 7 S.Ct. 234, 30 L.Ed. 425. We are not at liberty to indulge in speculation that the Republic of Italy will not recognize and live up to long established standards of comity and good faith. Nor are we free to presume that our Secretary of State will permit an extradition contrary to well known principles of fairness. The immediate decision in this respect lies not with the court, but with the Secretary of State. That decision is, essentially, one of international relations, peculiarly within the province of the State Department.

## V. Character of offenses charged: political or non-political.

Relator contends that the hearing before the Commissioner established beyond doubt that the offenses for which extradition is sought were of a political character and, under Article III of the Convention of 1868, non-extraditable. Counsel for relator has briefed the point extensively. According to relator, the acts to which he admitted might be ordinary crimes in an atmosphere free of any political ramifications, but because of the motivation for their commission, they must necessarily be deemed of a "political character". While the court is in general agreement with relator's exposition of the principles of law governing the non-extraditability of political offenders who have found asylum in this country, nevertheless it is the opinion of the court that the Commissioner's decision that the specific acts ascribed to relator in the complaint of the Republic of Italy were not of a political character, whatever his other acts during the period in question might have been, is supported by the evidence in the record. As we understand the scope of our duty in this habeas corpus proceeding, if we find that the Commissioner had jurisdiction of the subject matter and of the accused, and that his ruling was based on competent legal evidence, the application for the writ must be denied. The function of the writ is not to serve as a writ of error, or other appellate device. Ornelas v. Ruiz, supra. The Commissioner had before him the Italian record, testimony of relator, and testimony of various witnesses for the Republic of Italy. The hearings were lengthy; counsel for each side was given full opportunity to examine witnesses and present argument. The claim that what appeared to be common, ordinary crimes were so admixed with political motives and aims as to be of a political character within the meaning of the Convention of 1868 was based

solely on testimony of relator himself. This testimony, to the effect that relator worked for Torrese and that Torrese took orders from Guiliano, all to advance the political aims of a Sicilian separatist movement, was contradicted by statements taken from relator's admitted accomplices after their arrest in Italy, which tended to indicate that private gain was the sole motivating factor in these robberies. There was also testimony from a Mr. Russo, a witness offered as an expert by the Republic of Italy, who had spent considerable time in Sicily during the years when a Sicilian separatist organization was active, as a member of the Office of Strategic Services, a branch of our wartime forces. Russo testified at length and unqualifiedly, both on direct and on cross-examination, that Guiliano was a bandit who had no legitimate connection with the actual separatist movement, and that Guiliano described his activities as "political" to cloak their true purpose, i. e., private gain for himself and his followers. With the evidence before the Commissioner in such posture, this court cannot say that the Commissioner's decision was not supported by competent, legal evidence. The evidence was conflicting, it is true, but it did not preponderate so heavily in relator's favor as to require a decision that his offenses were political as a matter of law.

The Commissioner's decision to commit relator for extradition must stand undisturbed unless there is some merit in relator's final contention.

## VI. The refusal of the Commissioner to subpoena certain witnesses.

Relator contends that the Commissioner's refusal to order the subpoena of certain witnesses to testify on his behalf at the hearing was prejudicial error, a denial of due process of law, and contrary to the Convention of 1868. The claim is pressed particularly with reference to two individuals, one residing, presumably, in Great Britain, and the other in Italy, both of whom, it is asserted, are possessed of expert knowledge of the background of the Sicilian separatist movement in general, and the activities of Guiliano in particular. Relator's position is that he is entitled to have these and other witnesses subpoenaed in his behalf under 18 U.S.C. § 3191, which concerns the securing of witnesses for indigent fugitives in extradition hearings.

Section 3191 is as follows:

"On the hearing of any case under a claim of extradition by a foreign government, upon affidavit being filed by the person charged setting forth that there are witnesses whose evidence is material to his defense, that he cannot safely go to trial without them, what he expects to prove by each of them, and that he is not possessed of sufficient means, and is actually unable to pay the fees of such witnesses, the judge or commissioner hearing such matter may order that such witnesses be subpoenaed; and the costs incurred by the process, and the fees of the witnesses, shall be paid in the same manner as in the case of witnesses subpenaed in behalf of the United States."

At the hearing, the necessity of securing the testimony of these various witnesses, another of whom is a former President of the United States, was thoroughly explored, apparently in view of the requirement of Section 3191 that the evidence to be given by such witnesses be "material" to the "defense" of the person charged. The record indicates that relator's counsel hoped by these witnesses to establish that the Guiliano movement was political in nature. It was not claimed, however, that any of these witnesses knew anything of relator, or could link him with Torrese, or Torrese with Guiliano. And it was clear that none of these individuals could shed any light on the particular acts of robbery charged against relator, or the circumstances surrounding them.

Section 3191 gives the judge or commissioner conducting the hearing some

discretion; where a showing of the materiality of the evidence sought indicates that the person charged will be denied a fair hearing unless the witnesses are produced, the subpoenas should be ordered, however. Under the circumstances indicated in the present record, the Commissioner did not abuse his discretion in denying the relator's motion to subpoena these witnesses. The hearing was neither lacking in due process of law, nor contrary to the spirit or letter of the Convention of 1868.

It thus appears that all of relator's contentions are without merit. The order to show cause must be discharged and the relator retained in the custody of the United States Marshal to await the warrant of the Secretary of State authorizing his surrender to the Republic of Italy, or such other order as the Secretary of State may issue.

So ordered.