DE GARCIA v. UNITED STATES. See Case No. 15,186.

D▪▪▪NER (BABCOCK v.). See Case No. 698.

---

## Case No. 3,747.

### In re DE GIACOMO.

[12 Blatchf. 391;[1] 21 Int. Rev. Rec. 205.]

Circuit Court, S. D. New York. Dec. 24, 1874.

EXTRADITION TREATIES — EX POST FACTO OPERATION—RIGHT OF ASYLUM—CONSTITUTIONAL LAW.

1. Under the convention for the extradition of fugitives from justice, between the United States and Italy, concluded March 23, 1868 (15 Stat. 629), a person may be surrendered for the crime of murder committed in Italy before the making of the convention.

2. The various extradition treaties between the United States and foreign countries examin

---

[1] [Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission.]

ed, with a view of showing that some, on their face, exclude surrender for prior crimes, while others do not, and that prior crimes are included. where the language is capable of a construction including them, unless they are expressly excluded.

3. A person who has committed a crime abroad, and come to the United States before the making of an extradition treaty covering a surrender for such crime, has not thereby acquired a right of asylum of which he cannot be deprived

4. The restrictions in article 4 and article 5 of the amendments to the constitution of the United States, have no relation to the subject of extradition, as regulated by the convention with Italy and by statute.

5. Such convention, construed as covering the case of a crime committed before the treaty was made. is not open to the objection that it is a bill of attainder, or an ex post facto law, within the meaning of article 1, section 9, of the constitution of the United States.

Francis C. Bowen, for the prisoner.

Frederic R. Coudert, for the Italian government.

BLATCHFORD, District Judge. This is a writ of habeas corpus to inquire into the legality of the arrest and detention of Angelo de Giacomo, surnamed Ciccariello. He is in the custody of the marshal of the United States for this district, under a warrant issued by a United States commissioner, on the 25th of September, 1874, in proceedings for extradition instituted under the provisions of a convention for the surrender of criminals, concluded between the United States and the King of Italy on the 23d of March, 1868 (15 Stat. 629). This convention is one of those which requires that a requisition, accompanied by certain specified papers, must first be made by the proper diplomatic agent of the foreign power, for the surrender of the fugitive from justice, and that then the president of the United States may "issue a warrant for the apprehension of the fugitive, in order that he may be brought before the proper judicial authority for examination." The proceedings before the commissioner are before this court, on a writ of certiorari. On the application of the minister from Italy, the department of state or the United States, on the 9th of September, 1874, issued the usual mandate or warrant, authorizing proceedings to be had for the apprehension of the prisoner for the crime of murder, and for his examination as a fugitive from justice from Italy, with a view to his surrender pursuant to said convention. On the complaint of the consul general of Italy at New York, sworn to on the 24th of September, 1874, the commissioner issued the warrant on which the prisoner is held by the marshal. The complaint sets forth, that the prisoner, on the 29th of August, 1867, wilfully and maliciously killed one Airgliano, at or near San Simeone, in the kingdom of Italy, and refers for particulars to a warrant for the arrest of the prisoner, issued at Naples on the 17th of March, 1869, which accompanies the complaint. The prisoner

was arrested, and was brought before the commissioner on the 24th of October, 1874. The proceedings were adjourned from time to time until the 17th of November. On that day, the counsel for the prisoner objected before the commissioner, to any further proceeding in the case, on the ground that there was no treaty for extradition between the United States and Italy at the time the alleged offence was committed. The objection was overruled by the commissioner. Thereupon the proceedings were adjourned to a future day, and this writ of habeas corpus was granted. The only question raised upon it is the one so raised before the commissioner.

The warrant of arrest issued at Naples shows that the prisoner was indicted for the offence in question, at Naples, on the 19th of March, 1869, and that the warrant of arrest was issued on the same day. It does not appear that he has been convicted. The mandate from the department of state sets forth that the prisoner is "charged with the crime of murder." The convention provides (article 5) that, "if the person whose extradition may be asked for shall have been convicted of a crime," an authenticated copy of the sentence of the court in which he may have been convicted shall accompany the requisition; that, when he "shall have been merely charged with crime," an authenticated "copy of the warrant for his arrest in the country where the crime may have been committed, or of the depositions upon which such warrant may have been issued, must accompany the requisition;" and that then the president may "issue a warrant for the apprehension of the fugitive, in order that he may be brought before the proper judicial authority for examination."

The preamble of the convention sets forth, that it is expedient "that persons convicted of, or charged with, the crimes hereinafter specified, and being fugitives from justice, should, under certain circumstances, be reciprocally delivered up." The 1st article sets forth that the two governments "agree to deliver up persons who, having been convicted of, or charged with, the crimes specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other." The 2d article provides, that "persons shall be delivered up who shall have been convicted of, or be charged, according to the provisions of this convention, with any of the following crimes," including murder. The 3d article provides, that "the provisions of this treaty shall not apply to any crime or offence of a political character, and the person or persons delivered up for the crimes enumerated in the preceding article shall in no case be tried for any ordinary crime committed previously to that for which his or their surrender is asked."

The expression, "persons convicted of, or charged with, the crimes hereinafter specified, and being fugitives from justice,". and the expression, "persons who, having been convicted of, or charged with, the crimes specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other," and the expression, "persons * * * who shall have been convicted of, or be charged, according to the provisions of this convention, with any of the following crimes," are expressions which are as properly used to include crimes already committed as crimes to be afterwards committed. That the convention applies to future crimes, even if it does not apply to past crimes, and that the expressions just quoted apply to future crimes, even if they do not apply to past crimes, are propositions not disputed and not to be disputed. In other words, it is not, and could not, be contended, that the convention applies only to crimes committed before the making of the convention. The preamble to the convention says, that it is made "with a view to the better administration of justice, and to the prevention of crimes" within the "respective territories and jurisdiction" of the two governments. Justice may be better administered, and crime may be prevented, as consequent upon extraditing a person for a crime committed before the making of the treaty, quite as much as consequent upon extraditing a person for a crime committed after the making of the treaty. The expression, "a person charged with murder and being a fugitive from justice," does not require that the person shall commit the murder in the future. If he has committed the murder and fled from justice before the making of the treaty, and is, after the making of the treaty, charged with the crime, he answers the description of "a person charged with murder and being a fugitive from justice." The expression, "a person who, having been charged with murder, committed in Italy, shall seek an asylum, or be found, within the United States," does not require that the person shall commit the murder in the future. If he has committed the murder in Italy before the making of the treaty, and is, after the making of the treaty, charged with the crime, and found within the United States, he answers the description of "a person who, having been charged with murder, committed in Italy, shall be found within the United States." And, even though he fled from justice before the making of the treaty, and, before the making of the treaty, came into the United States with a view of obtaining an asylum there, and remained there permanently, after coming there, until found there after the making of the treaty, he was at all times a fugitive from justice, after he first fled, and continued to be such down to the time of his being found within the United States, and is such when so

found, and he was at all times the seeker of an asylum within the United States, after his first arrival there, down to the time of his being found there, and is such when so found. He does not seek such asylum only at the moment when he first reaches our shores. The word "asylum" includes not only place, but, also, shelter, security, protection; and a fugitive seeks such asylum at all times when he claims the use of the territories of the United States as an asylum. The expression, "a person shall be delivered up, who shall be charged with murder," and the expression, "a person shall be delivered up, who shall have been charged with murder," do not require that the person shall commit the murder in the future. If he has committed the murder in Italy before the making of the treaty, and is, after the making of the treaty, charged with the crime, he answers the description of "a person who shall be charged with murder," and the description of "a person who shall have been charged with murder."

Another mode of stating the question leads to the same result. If the contracting parties had been advised, when making the treaty, that this particular murder had been committed by the prisoner, and that he had fled to the United States, but had neither been convicted of the crime nor formally charged with it, and had designed to use language, in the treaty, which would provide for the extradition of the prisoner, when he should be formally charged with the crime, and his surrender be asked for, they could not have used language more aptly chosen to carry out such design, than that which is used in the treaty, the same language being intended to cover also future crimes. Hence, in the preamble, they say they design to deliver up persons convicted of or charged with murder, which includes persons thereafter to be convicted and persons thereafter to be formally charged, but covers crimes committed before the making of the treaty. Then, in the 1st article, they agree to deliver up persons who, having been convicted of or charged with murder, committed within the jurisdiction of one government, shall be found within the territories of the other, which includes persons thereafter to be convicted and thereafter to be formally charged, but covers crimes committed before the making of the treaty. Then, in the 2d article, they contract that persons shall be delivered up, who shall have been convicted of or charged with murder, which includes persons thereafter to be convicted and thereafter to be formally charged, but covers crimes committed before the making of the treaty.

The foregoing considerations lead to the conclusion, that there is nothing in this convention which excludes extradition for crimes previously committed, and nothing inconsistent with a construction of the convention, that such crimes are included within the convention, and were intended to be so included. But, the correctness of this conclusion becomes more apparent, when, on a comparison of this convention with other extradition treaties made by the United States, it is seen that there are some of such treaties made before and some since the convention in question, which take pains, in their language, to exclude prior crimes, while this convention contains no such exclusion. As has been already seen, there is, in this convention, a limitation article, the 3d, which declares what the provisions of the treaty shall not apply to. It enumerates political offences, and then provides that a person surrendered shall not be tried for any ordinary crime committed prior to that for which his surrender is asked. A limitation article as to offences first makes its appearance in the treaty with France, of November 9, 1843 (8 Stat. 582). Article 5 of that treaty provides, that its provisions shall not be applied to any crimes committed anterior to its date, nor to any political offence. In the treaty with the Swiss Confederation, of November 25, 1850 (11 Stat. 594), article 17 provides, that the treaty shall not apply to offences committed before its date, nor to those of a political character. In the treaty with the Two Sicilies, of October 1, 1855 (Id. 653), article 24 contains like provisions. In the treaty with Austria, of July 3, 1856 (Id. 692), article 1 contains like provisions. In the treaty with Baden, of January 30, 1857 (Id. 715), the limitation as to offences (article 1) only excludes those of a political character, and does not exclude offences committed before the date of the treaty. In the treaty with Sweden and Norway, of March 21, 1860 (12 Stat. 1126), the exclusion (article 5) is only of political offences. In the treaty with Venezuela, of August 27, 1860 (12 Stat. 1160), the limitation article (article 30) returns to the practice of excluding offences committed before the date of the treaty, as well as political offences. In the treaty with Mexico, of December 11, 1861 (Id. 1202), the limitation article (article 6) excludes political offences, and the return of fugitive slaves, and crimes committed by slaves, and crimes committed anterior to the date of the exchange of the ratifications of the treaty, which date was more than five months after the date of the treaty. In the treaty with Hayti, of November 3d, 1864 (13 Stat. 728), the exclusion (article 41) is of offences committed before the date of the treaty, and of those of a political character. In the treaty with the Dominican republic, of February 8th, 1867 (15 Stat. 489), the exclusion (article 30) is in like terms. Next in order of time follows the treaty now in question, with Italy. After excluding, in three treaties made in 1850, 1855 and 1856, offences committed before the date of the treaty, two treaties were made, in 1857 and 1860, which did not exclude such offences, and then four treaties were made, in 1860, 1861, 1864 and 1867, excluding such offences,

and then this treaty with Italy was made, in 1868, not excluding such offences. Here is evidence of intention and design in excluding past crimes from some treaties and not excluding them from others, showing that the understanding was that past crimes would be included, where the language was capable of a construction including them, unless they were expressly excluded. In all the treaties which do not expressly exclude them, the language is as apt and proper to include them as in this treaty with Italy. Passing now to treaties subsequent to that with Italy, the limitation article (article 3) of the treaty with Nicaragua, of June 25, 1870 (17 Stat. 817), is precisely like that of the treaty with Italy. So, also, is the limitation article (article 3) of the treaty with Salvador, of May 23d, 1870 (18 Stat. "Treaties," 11). But, the like article (article 3) in the treaty with Peru, of September 12, 1870 (18 Stat. "Treaties," 37), excludes offences of a political character, and crimes committed anterior to the date of the exchange of the ratifications of the treaty. So, also, the like article (article 12) in the treaty with the Orange Free State of December 22, 1871 (18 Stat. "Treaties," 67), excludes offences committed before the date of the treaty and political offences. But the like article (article 3) in the treaty with Ecuador, of June 28, 1872 (18 Stat. "Treaties," 74), excludes only political offences. We then come to the latest published extradition treaty made by the United States, that with Belgium, made March 19, 1874 (18 Stat. "Treaties," 120). It is substantially identical with the treaty with Italy, and drafted on the same model, except in the following particular. The 3d article of it is in these words: "The provisions of this treaty shall not apply to any crime or offence of a political character, nor to any crime or offence committed prior to the date of this treaty, except the crimes of murder and arson; and the person or person delivered up for the crimes enumerated in the preceding article, shall in no case be tried for any crime committed previously to that for which his or their surrender is asked." There is, in this article, a clear indication that the contracting parties understood that crimes committed prior to the making of the treaty would be within its terms, unless they should be expressly excluded by it from its operation; that, having in view and in mind crimes which might have been committed before the date of the treaty, they proceeded to declare that they should be excepted from the operation of the treaty; and that then, having in view and in mind the crimes or murder and arson which might have been committed before the date of the treaty, they proceeded to declare that those two crimes, committed before the date of the treaty, should not be excepted from its operation, by virtue of the general clause excepting crimes committed prior to the date of the treaty. The language of this 3d article of the treaty with Belgium, in connection with

the language of the prior treaties, is evidence of the fact, that, in all of the treaties, the language being such as to admit of the including of prior crimes, the general rule is understood by the contracting parties to be, that prior crimes are included, and that where they are not included it is because they are expressly excepted in the treaty.

It is not shown by the papers before the court, whether the prisoner came into the United States before or after the treaty with Italy became the law of the land. But, on the view which must be taken of the case, that point is immaterial. The counsel for the prisoner, on the assumption that the prisoner came into the United States before the treaty became effective, contends that, before the treaty became effective, the prisoner had acquired a right of asylum in the United States, based on the fact of his having sought and acquired an asylum there; that such right was and is a substantial personal right; and that such right cannot be taken away from the prisoner, by the government of the United States, under a treaty which comes into operation after such right has been acquired. It is further contended, that the United States have no right to make a treaty for extradition which shall apply to crimes committed before the ratification of the treaty; and that such a treaty is open to all the objections which apply to the enactment of an ex post facto law.

While the question of the duty or obligation of one government, independently of treaty stipulations, to surrender to another government a fugitive from justice, so as to make a refusal to surrender a valid ground of complaint or cause of war, has been much discussed, and while it may not be regarded as settled, that the executive of the United States has the right to surrender a fugitive from justice, independently of statute or treaty, as against a claim of the fugitive that no such right of surrender exists, yet it is not to be questioned, that a treaty stipulation, on the part of the government of the United States, to surrender fugitives from justice, is a lawful stipulation, and within the authority of the treaty making power. The principle on which treaties for extradition are made is, that no nation ought to permit its territory to be made a place of refuge for criminals. This principle is violated by the mere fact of finding the fugitive in such territory, as a place of refuge, without reference to the particular time when the crime was committed. Therefore, if there be no affirmative restriction existing, which limits the power of the government to make a treaty which covers the surrender of fugitives for crimes committed before the making of the treaty, and if the treaty, in the present case, covers the case of the prisoner, no ground exists for his discharge.

It am not prepared to admit that a person who has committed a crime abroad and fled to this country has acquired a right of asy-

lum here, as a personal right, so that, under a subsequent law, whether treaty or statute, he cannot be delivered up as a fugitive from justice. If there be any want of power to deliver him up, it must be found in a constitutional restriction upon the power to make a treaty, or to pass a statute, covering extradition for a crime previously committed. The general right to make treaties for extradition, and to deliver up fugitives thereunder, cannot be denied to the government of the United States. The restriction, in article 4 of the amendments to the constitution, against violating the right of the people to be secure in their persons against unreasonable seizures, and the restriction, in article 5 of such amendments, against depriving a person of liberty without due process of law, are restrictions which, if applicable at all to the subject of extradition, would extend to cases of extradition for crimes committed after the making of a treaty as fully as to crimes committed before. But they have no relation to the subject of extradition for crime, as regulated by the treaty in question and the statutes of the United States passed on the subject.

But, the constitution contains (article 1, § 9) a provision, that "no bill of attainder or ex post facto law shall be passed," and a provision (article 1, § 10) that no state shall pass any bill of attainder or ex post facto law. Assuming that a treaty must be regarded as a law, within the inhibition, is this treaty, in the particular in question, an ex post facto law or a bill of attainder? A bill of attainder is defined to be "a legislative act which inflicts punishment without a judicial trial," where the legislative body exercises the office of judge, and assumes judicial magistracy, and pronounces on the guilt of a party without any of the forms or safeguards of a trial, and fixes the punishment. Cummings v. Missouri, 4 Wall. [71 U. S.] 323. This treaty does none of these things, nor do any of the statutes for carrying the treaty into effect contain provisions which fall within such definition.

By an ex post facto law is meant one which imposes a punishment for an act which was not punishable at the time it was committed, or imposes additional punishment to that then prescribed, or changes the rules of evidence, by which less or different testimony is sufficient to convict than was then required. Cummings v. Missouri, 4 Wall. [71 U. S.] 326. It is said, in Calder v. Bull, 3 Dall. [3 U. S.] 390, that the meaning of the prohibition against passing ex post facto laws is, that laws shall not be passed "after a fact done by a subject or citizen, which shall have relation to such fact, and shall punish him for having done it." It is also there said: "Every ex post facto law must necessarily be retrospective, but every retrospective law is not an ex post facto law." It is contended, in the present case, that the effect of extradition for a crime committed before the making of the treaty is to punish the party, by depriving him of his liberty, and sending him out of the United States, and delivering him up to a foreign authority, and to punish him for remaining and being found in the United States, when he could not have been thus punished at the time the treaty was made. But, the fact of extradition cannot properly be regarded as "punishment," within the sense of that word, as used when considering the subject of ex post facto laws. There is no offence against the United States, and no trial for any such offence, and no punishment for any such offence. It is true, that extradition relates only to criminal offences, but it relates only to criminal offences committed abroad; and no treaty for extradition, nor any statute passed in relation to extradition, purports to punish the fugitive for the offence. Both treaties and statutes assume that he is to be tried upon the charge, if not already convicted. With the question of punishment, or its kind or degree, they have no concern. They merely declare that the protection of this government shall not be interposed between the fugitive and the laws which he has violated, and that, if he flees hither for such protection, the injured government may take him hence, and shall be aided therein. This government neither assumes nor exercises any power to punish for the crime. The fact that the fugitive is deprived of his liberty does not make such deprivation a punishment. Loss or suffering to the party supposed to be punished is not punishment, in a legal sense, unless the punishment is inflicted as a penalty for the commission of crime. If extradition for an anterior crime is punishment, extradition for a subsequent crime is equally punishment. But, it is an incorrect idea of punishment, to say that the United States, in every case of extradition, is punishing the party for the offence committed abroad, by extraditing him. It being assumed that the prisoner committed a murder abroad, and then fled to the United States, and that the treaty was afterwards made, it is not a punishment of the prisoner to deprive him of his liberty, under the treaty, and surrender him to the foreign authority, so as to make the treaty obnoxious to the objection that it is an ex post facto law. As this question is a novel and important one, and has arisen in the circuit court, I have thought it proper to submit these views to the circuit judge, and am authorized to say that he concurs in them. The writs must be discharged, and the prisoner be remanded to the custody of the marshal under the warrant issued by the commissioner.