**Timoteo Leite HILARIO, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

**No. CV 94–1525 (RR).**

United States District Court,
E.D. New York.

June 6, 1994.

---

The Legal Aid Society Federal Defender Div. E.D.N.Y. by Abraham L. Clott, Brooklyn, NY, for petitioner.

Zachary W. Carter, U.S. Atty., E.D.N.Y. by Raymond Granger, Asst. U.S. Atty., Brooklyn, NY, for respondent.

## MEMORANDUM AND ORDER

RAGGI, District Judge:

By order dated March 29, 1994, Magistrate Judge John L. Caden certified to the Secretary of State that Timoteo Leite Hilario was extraditable to Portugal, a country from which he had fled in 1988 while serving a sentence for murder and attempted murder. Because certifications of extradition are not subject to direct appeal, Hilario pursues a writ of habeas corpus to challenge the magistrate judge's order. *See Jhirad v. Ferrandina,* 536 F.2d 478, 482 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); *Shapiro v. Ferrandina,* 478 F.2d 894, 901 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973).

The focus of Hilario's challenge is narrow. He does not dispute this court's personal jurisdiction over him. Neither does he challenge the effectiveness of the Extradition Convention of 1908 between the United States and Portugal ("the Convention"). *See* Extradition Convention and Exchange of Notes Concerning the Death Penalty, May 7, 1908, U.S.–Port., 35 Stat. 2071. He concedes that the crimes of murder and attempted murder are covered by this Convention and he cites no deficiency in the evidence produced by Portugal to establish his conviction for such crimes. His single challenge to extradition is that the Secretary of State lacks legal authority to surrender him to Portugal because he is a United States citizen.

Having carefully considered the written submissions of the parties and having heard oral argument, this court rejects petitioner's challenge. Although the Convention does not, by its own terms, empower the Secretary of State to surrender a United States citizen to Portugal, such power is clearly

conferred by 18 U.S.C. § 3196 (Supp.1994). Petitioner's constitutional and legal challenges to that statute are without merit. His petition for a writ of habeas corpus is, therefore, denied.

## Factual Background

### 1. Hilario's Murder Conviction in Portugal

In late 1982, while in Boticas, Portugal, Timoteo Leite Hilario quarrelled with his seventeen-year old son, Antonio. The boy left his father's home and took up residence nearby with his paternal grandmother. On January 3, 1983, petitioner, in the presence of his mother and brothers, confronted his son and ordered him to return home. When the son refused, petitioner began shooting, killing his brother Jaime, and injuring both his son and brother Ramiro.

On December 7, 1983, petitioner was convicted in the Judicial Court of Boticas of one count of murder and two counts of attempted murder. He was sentenced to a fourteen-year term of incarceration. On intermediate appeal, petitioner's conviction was affirmed, but his sentence was increased to sixteen years. In 1984, Portugal's Supreme Court of Justice also affirmed the conviction, but suspended two years of the sixteen-year sentence.

### 2. Petitioner's Flight from Portugal and Arrest in the United States

On August 13, 1988, Portuguese authorities granted Hilario a furlough from prison. While on furlough, petitioner apparently fled Portugal. Some time thereafter, he entered the United States, where he had become a citizen in 1977.

In July 1993, federal authorities learned that Hilario was being detained in Nassau County, New York on unspecified state charges. After communicating with Portuguese officials, the United States, on July 15, 1993, sought and obtained a provisional warrant for Hilario's arrest in anticipation of extradition. See 18 U.S.C. § 3184 (Supp. 1994). Hilario was arrested on this warrant on August 24, 1993, and has been in federal custody since that time.

### 3. The Magistrate Judge's Certification of Extradition

On November 4, 1993, the United States filed with Magistrate Judge Caden the certified submissions of Portugal in support of the request for Hilario's extradition. Hilario did not challenge the adequacy of the filing. But he did urge dismissal of the extradition complaint on the grounds that, as a United States citizen, he could not be extradited to Portugal. Specifically, Hilario argued: (1) that the Convention does not authorize the surrender of United States citizens to Portugal; (2) that such authority can only be conferred by treaty; (3) that Congress's attempt to confer such power to the Secretary of State in 18 U.S.C. § 3196 is unconstitutional; and (4) that even if § 3196 were constitutional, it should not apply to criminal conduct, such as petitioner's, that predates its enactment. Although petitioner's first point is undisputed, Magistrate Judge Caden rejected his other arguments. Accordingly, on March 29, 1994, Magistrate Judge Caden certified Hilario's extraditability to the Secretary of State. See 18 U.S.C. § 3184.

## Discussion

### I. The Constitutionality of 18 U.S.C. § 3196

■ The power to provide for extradition unquestionably belongs to the federal government. *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 8, 57 S.Ct. 100, 102, 81 L.Ed. 5 (1936). But the exercise of such sovereign power "must finds its sanction in our law." *Id.* Because the Constitution does not itself vest authority in any government department " 'to seize a fugitive criminal and surrender him to a foreign power,' " *id.* at 9, 57 S.Ct. at 102 (quoting 1 John Basset Moore, *Moore on Extradition* 21), a court must look elsewhere for evidence of legal empowerment to extradite. The government submits that 18 U.S.C. § 3196 statutorily empowers the Secretary of State to extradite petitioner in this case. Hilario challenges the constitutionality of this statute. He insists that the power to extradite can only be conferred by treaty. This court disagrees.

### A. The Lack of Executive Power to Extradite in the Convention between the United States and Portugal

No one disputes petitioner's contention that the Extradition Convention between the United States and Portugal does not itself confer power on any government official to extradite American citizens to Portugal. This conclusion is, in fact, mandated by the Supreme Court's decision in *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936). A preliminary review of the Convention and the *Valentine* holding is useful to this court's assessment of petitioner's challenge.

Article I of the Convention provides for the reciprocal surrender of persons charged with or convicted of specified crimes in either the United States or Portugal. It states:

> It is agreed that the Government of the United States of America and the Government of His Most Faithful Majesty the King of Portugal and of the Algarves shall, upon mutual requisition duly made as herein provided, deliver up to justice any person who may be charged with or may have been convicted of any of the crimes specified in Article II of this Convention committed within the jurisdiction of one of the Contracting Parties while said person was actually within such jurisdiction when the crime was committed, and who shall seek an asylum or shall be found within the territories of the other, provided that such surrender shall take place only upon such evidence of criminality, as according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offence had been there committed.

This broad mutual obligation is, however, significantly modified by Article VIII:

> Under the stipulations of this Convention, neither of the Contracting Parties shall be bound to deliver up its own citizens or subjects.

Such citizen exception clauses are not unusual. Virtually identical ones are to be found in thirty-three other extradition treaties signed by the United States. *Gouveia v. Vokes*, 800 F.Supp. 241, 244 (E.D.Pa.1992).

One of these other treaties—between the United States and France—was the focus of Supreme Court attention in *Valentine*. At issue was the power of the United States to extradite American citizens when such surrender was not required by treaty. The government in *Valentine* argued that the executive branch was implicitly empowered to extradite American citizens to France because the citizen exception clause reserved to each sovereign the discretion to surrender its own nationals. The Supreme Court was unpersuaded. Certainly, if a treaty obliged the United States to surrender *all* persons who came within its terms, then a court could assume that ratification of the treaty necessarily conveyed the power to meet that obligation, even as to United States citizens. *Valentine v. United States ex rel. Neidecker*, 299 U.S. at 7, 57 S.Ct. at 101; *see Charlton v. Kelly*, 229 U.S. 447, 467–68, 475–76, 33 S.Ct. 945, 951–52, 954–55, 57 L.Ed. 1274 (1913) (where treaty provides for extradition of "all persons," the United States is obliged to surrender its own nationals even if other country refuses to do so). But a treaty exception clause "denying an obligation" to surrender nationals could not fairly be translated into "a grant of power" to surrender citizens "in the discretion of the Executive." *Valentine v. United States ex rel. Neidecker*, 299 U.S. at 10, 57 S.Ct. at 103. Thus, the Supreme Court ruled that an express "treaty or legislative provision" conferring such power was required. *Id.* at 8, 57 S.Ct. at 102.

The decision in *Valentine* was influenced by the fact that the United States had begun to include empowerment language in certain treaties with citizen exception clauses. For example, the 1886 extradition treaty between the United States and Japan, while providing that "[n]either of the contracting parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention," continued by noting "but they shall have the power to deliver them up if in their discretion it be deemed proper to do so." *Id.* at 12, 57 S.Ct. at 104. Since *Valentine*, virtually every extradition treaty entered into by the United States reserving discretion as to the extradition of nationals has included similar language ensuring domestic

empowerment. *See* Section-by-Section Analysis of the National Drug Control Strategy Implementation Act of 1990, 136 Cong.Rec. S6598 (daily ed. May 18, 1990).

### B. *The Enactment of 18 U.S.C. § 3196*

It was not until 1990, over fifty years after the *Valentine* ruling, that Congress focused its attention on those treaties, such as the Convention with Portugal, that lacked any language empowering the executive branch to extradite United States citizens. Section 11 of the International Narcotics Control Act of 1990 (originally introduced as the National Drug Control Strategy Implementation Act of 1990) sought to cure the empowerment problem through a single piece of legislation. Now codified at 18 U.S.C. § 3196, the relevant law provides:

> If the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen whose extradition has been requested by that country if the other requirements of that treaty or convention are met.

Despite the plain language of § 3196, Hilario insists that the Secretary of State is without power to extradite him. He asserts that the statute is an unconstitutional "attempt to override a treaty." (Petitioner's Mem. at 4.) He submits that just as a treaty can only be made by the President with the advice and consent of two-thirds of the Senate, U.S. Const., art. II, § 2, cl. 2, so a treaty can only be amended by the same constitutional process. The fatal flaw in petitioner's argument is that § 3196 does not override, alter, or amend any provision in the Convention between the United States and Portugal.

### C. *The Relationship Between Article VIII and § 3196*

This court's analysis necessarily begins with the plain language of Article VIII of the Convention. Treaties, like statutes, must be construed by giving their terms their ordinary meaning consistent with the object and purpose of the signatories. *See United States v. Stuart,* 489 U.S. 353, 365–66, 109 S.Ct. 1183, 1190–91, 103 L.Ed.2d 388 (1989); *Sumitomo Shoji American, Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982); *see also* Vienna Convention on the Law of Treaties, Jan. 27, 1980, art. 31(1), 1155 U.N.T.S. 331, 8 I.L.M. 679 (1969).[1]

The language of Article VIII reveals a clear but limited purpose. The signatories simply note that their mutual obligation to extradite, undertaken pursuant to Article I, will not apply to requests for the surrender of their own citizens. *See Valentine v. United States ex rel. Neidecker,* 299 U.S. at 11, 57 S.Ct. at 103 (interpreting similar clause in extradition treaty with France to mean that the two governments "mutually agree to deliver up persons except [their] own citizens or subjects"). On this point—the surrender of nationals—each signatory retains full sovereign discretion without any risk of breach.

Clauses such as Article VIII derive from a need to accommodate differences in domestic laws, particularly between common law countries, which have generally been willing to extradite their own citizens, and certain civil law countries, which, at least since the 18th century, have prohibited such surrenders. *See* 2 M. Cherif Bassiouni, *International Extradition,* ch. VIII, § 3–1 (1983); *Charlton v. Kelly,* 229 U.S. at 467, 33 S.Ct. at 951–52 ("Owing to the existence in the municipal law of many nations of provisions prohibiting the extradition of citizens, the United States has in several of its extradition treaties clauses exempting citizens from their obligation."). But an exception clause intended simply to accommodate a signatory's domestic laws cannot be read as the equivalent of a treaty prohibition on a signatory changing its laws to facilitate the extradition of its own nation-

---

**1.** Although the United States has not ratified the Vienna Convention, it is a signatory. Moreover, the Second Circuit has looked to its terms in interpreting treaties. *E.g., Haitian Ctrs. Council, Inc. v. McNary,* 969 F.2d 1350, 1362 (2d Cir. 1992), *rev'd on other grounds sub nom., Sale v.* *Haitian Ctrs. Council, Inc.,* — U.S. —, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 36 (2d Cir. 1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

als. Such an interpretation would be odd indeed, for while it is easy to understand why a country would wish to reserve to itself the discretion not to extradite its nationals, it is difficult to imagine what interest that same country would have in limiting another sovereign's ability to do so.

In sum, the plain language of Article VIII does not obligate either signatory to extradite its own nationals. But nothing in the language prohibits either sovereign from exercising discretion to extradite nationals consistent with its own domestic laws and policies.

Once Article VIII is thus understood, it necessarily follows that 18 U.S.C. § 3196 does not amend any international obligation of the United States pursuant to the Convention. What the statute does is fill a gap in our domestic law. The Secretary of State is now empowered by Congress to exercise this country's sovereign discretion to extradite American citizens as the national interest dictates. But this empowerment is discretionary: "the Secretary of State may ... order the surrender ... of a United States citizen." 18 U.S.C. § 3196. He is not required to do so. Thus, the statute in no way diminishes the rights reserved to the signatories in Article VIII. Both before and after the enactment of § 3196, the United States retains *complete* discretion under the Convention to refuse a request for the extradition of its citizens.

The conclusion this court draws from the plain language of Article VIII and § 3196— that the statute does not amend the treaty— is further recommended by the general principle that "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." *Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. 138, 160, 54 S.Ct. 361, 367, 78 L.Ed. 695 (1934). Instead, whenever possible, courts must "endeavor to construe" treaties and statutes "so as to give effect to both, if that can be done without violating the language of either." *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888); *accord Baker v. Carr,* 369 U.S. 186, 212, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962) (a court "will not undertake to construe a treaty

in a manner inconsistent with a subsequent federal statute").

Thus, in *Grin v. Shine,* 187 U.S. 181, 23 S.Ct. 98, 47 L.Ed. 130 (1902), the Supreme Court held that, although the extradition treaty between the United States and Russia seemed to demand the production of an arrest warrant or equivalent document issued by a magistrate of the Russian Empire before an extradition request would be entertained, Congress could dispense with this requirement, as it had apparently done by enacting Rev.Stat. § 5270, a predecessor to 18 U.S.C. § 3184. *Id.* at 191, 23 S.Ct. at 102. The Court drew a distinction between statutes prescribing "additional formalities" for extradition beyond those required by treaty, and the United States' voluntary waiver of treaty requirements. While the former might well become the subject of complaint by the co-signatory to the treaty, the latter was of no international import and, therefore, not at odds with our treaty obligations. *Id.*

In *Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.,* the Supreme Court found no inconsistency between a 1901 statute—authorizing the plaintiff to improve the Pigeon River and to collect a fee for all timber passing thereon—and an 1842 treaty with Canada—declaring that all portages along the international boundary, including portions of the Pigeon River, "shall be free and open to the use of the citizens and subjects of both countries." 291 U.S. at 148, 54 S.Ct. at 362. At the time the treaty was passed, natural obstructions precluded using the river for logging. Under such circumstances, the Court deemed it essential to read the treaty and subsequent statute practically.

> [W]e are not convinced that it was the intention [of the signatories to the treaty] either to preclude an improvement which would make a stream along the boundary available for use theretofore impossible, or to prevent a reasonable and non-discriminatory charge for the use of such an improvement. In the terms of the treaty we find no compelling clarity of prohibition.

*Id.* at 157–58, 54 S.Ct. at 366.

Similarly, in *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951), the

Supreme Court found that Section 3(a) of the Selective Training and Service Act of 1940 was not in conflict with an earlier United States treaty with Switzerland. The statute exempted neutral aliens from United States military service, but then barred those who claimed the exemption from obtaining American citizenship. The Swiss treaty, however, had long guaranteed that "[t]he citizens of one of the two countries, residing or established in the other, shall be free from personal military service." *Id.* at 42, 71 S.Ct. at 554. Switzerland protested the application of Section 3(a) to its nationals. It insisted that, under the treaty, Swiss residents of the United States were entitled to unconditional release from military service with no limitation on their right to apply for United States citizenship. But the Supreme Court did not agree.

> That the statute unquestionably imposed a condition on exemption not found in the Treaty does not mean they are inconsistent.... The treaty makes no provision respecting citizenship. On the contrary, it expressly provides that the privileges guaranteed by each country to resident citizens of the other "shall not extend to the exercise of political rights." The qualifications for and limitations on the acquisition of United States citizenship are a political matter which the Treaty did not presume to cover.

*Id.* at 45–46, 71 S.Ct. at 555 (citations omitted).

Section 3196 and Article VIII of the Convention are as easily reconciled as any of the laws and treaties at issue in these cases. Certainly, § 3196 does not prescribe any "additional formalities" for extradition beyond those agreed to by the signatories. *See Grin v. Shine,* 187 U.S. at 191, 23 S.Ct. at 102. It simply empowers the Secretary of State to exercise the discretion reserved by Article VIII to each sovereign. In short, its legal scope is domestic, not international. Similarly, the fact that the Convention contains "no provision" dealing with the domestic issue of

empowerment does not render subsequent legislation on the issue inconsistent with the treaty. *See Moser v. United States,* 341 U.S. at 45, 71 S.Ct. at 555. The Convention is concerned only with ensuring that neither signatory be obliged to extradite its nationals. It does "not presume to cover" the domestic circumstances under which each country might voluntarily surrender a citizen. *Id.* Most important, the Convention contains no "compelling clarity of prohibition" on the United States' enactment of legislation authorizing the extradition of its nationals. *See Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. at 158, 54 S.Ct. at 366. Indeed, there would be no reason for such a prohibition since domestic legislation such as § 3196 does not alter the absolute right guaranteed to each signatory under Article VIII to deny a request for the extradition of its citizens.

### D. *The Contrary View in* **Gouveia v. Vokes**

This court's conclusion that § 3196 does not alter or amend Article VIII of the Convention differs from that reached in *Gouveia v. Vokes,* 800 F.Supp. 241 (E.D.Pa.1992), the only other case to address the relationship between this particular statute and convention. Citing extensively to an analysis of the legislation filed in the Congressional Record at the time the National Drug Control Strategy Implementation Act was introduced, *Gouveia* concluded that "the explicit words and purpose of what became § 3196 was *to amend,* at a minimum, *Article VIII of the 1908 Treaty* [with Portugal] and the similar language of the other thirty-three treaties like it." *Id.* at 250 (emphasis added). The court thought that to "countenance *such overt, explicit Congressional amendment* [of a treaty] would ignore the "allocation of responsibility" for treaty making established by the Framers in the Constitution. *Id.* at 259 (emphasis added).[2]

This court's own review of the analysis of the legislation placed in the Congressional

---

**2.** Ultimately, *Gouveia* avoided declaring § 3196 unconstitutional, holding simply that the statute could not be applied retroactively to a person whose extradition had already been denied once prior to enactment of § 3196. 800 F.Supp. at

259–60. The decision was never reviewed by the Third Circuit since an agreement was apparently worked out between the parties for Gouveia's return to Portugal. (*See* Respondent's Mem. at 6 n. 8.)

Record does not permit it to join in *Gouveia*'s conclusion as to Congress's intent. The pertinent passage of the analysis states:

This amendment deals with a problem that arises under some of our older extradition treaties that fail to include specific authority to extradite United States nationals who are charged with crimes in the country seeking extradition. Under prevailing case law, the United States may extradite its nationals in the absence of any limiting language in a bilateral treaty. *Charlton v. Kelly,* 229 U.S. 447 [33 S.Ct. 945, 57 L.Ed. 1274] (1913). However, if an extradition treaty contains language which limits that authority, e.g., "neither party shall be bound to deliver up its own citizens", the Supreme Court has held that United States nationals may not be extradited unless the treaty also contains a positive grant of authority to surrender United States citizens. *Valentine v. United States ex rel. Neidecker,* [299] U.S. 5, 7–12 [57 S.Ct. 100, 101–04, 81 L.Ed. 5] (1936). Post-*Valentine* extradition treaties of the United States uniformly contain language such as "[N]either of the contracting Parties shall be bound to deliver up its own citizen under the stipulations of this convention, *but the executive authority of each shall have the power to deliver them up, if, in its discretion, it is deemed proper to do so.*" [emphasis in original] Such a clause contains the necessary positive grant of authority to the Executive to extradite United States citizens.

However, the United States still has several pre-*Valentine* treaties in force that contain the limitation but lack a requisite grant of authority. In those instances, the United States must refuse to extradite based on the nationality of the offender. . . .

The proposed amendment would remedy the problem caused by some pre-*Valentine* treaties by expressly permitting the surrender of United States nationals notwithstanding the language of limitation in those treaties. This provision is consistent with the general policy of the United States favoring extradition of nationals to the country where the greatest harm has been suffered because of the commission of criminal acts, and against creating "universal" extraterritorial jurisdiction. It also recognizes the reality that it is not feasible to address this situation on a piecemeal basis by renegotiating all the pre-*Valentine* treaties that contain this flaw.

Section-by-Section Analysis of the National Drug Control Strategy Implementation Act of 1990, 136 Cong.Rec. S6598 (daily ed. May 18, 1990).[3]

Only two statements in this analysis possibly support *Gouveia*'s conclusion that Congress's intent in enacting § 3196 was to amend treaties: (1) the language suggesting that citizen exception clauses somehow "limit" executive authority to extradite United States citizens, and (2) the characterization of § 3196 as an "amendment."

The first statement may, in fact, be nothing more than a shorthand acknowledgement of *Valentine*'s holding that, absent other authority, United States officials are "limited" in their ability to extradite American citizens pursuant to extradition treaties containing citizen exception clauses. To interpret it more broadly—as a statement that such clauses themselves limit executive authority to extradite—simply misreads *Valentine.* As the Supreme Court made plain in its ruling, the constitutional problem with citizen exception clauses is not that they *limit* the exercise of sovereign authority to extradite nationals. The problem is that such clauses cannot fairly be read to *confer* such authority, and such conferral is constitutionally required before an American citizen can be surrendered to a foreign country.

As to the use of the word "amendment" in the analysis, it is elsewhere made plain that

---

**3.** Not insignificantly, it was not a congressional committee that drafted this analysis, but rather the Office of National Drug Control Policy, the executive agency that apparently drafted the National Drug Control Strategy Implementation Act of 1990. (*See* Letter from William J. Bennett, Director of National Drug Control Policy, to [Vice President] J. Danforth Quayle of 5/6/90, *reprinted in id.* at S6609.) Such a draftsman's views must be considered cautiously in light of the earlier-discussed principle that intent to amend a treaty may not be lightly imputed to Congress.

what the proposed legislation amended was not any extradition treaty, but Chapter 209 of Title 18, United States Code, dealing with domestic extradition procedures. When the statute was introduced into the record on May 18, 1990, it specifically stated:

> Chapter 209 of title 18, United States Code, is amended by adding at the end thereof the following new section:
>
> "Sec. 3196. *Extradition of United States Citizens*
>
> The Secretary of State shall have the discretion to order the surrender to a foreign country of a United States citizen whose extradition has been requested by the foreign country, even if the terms of the applicable treaty or convention do not obligate the United States to extradite its citizens, if the other requirements of the applicable treaty or convention are met."

136 Cong.Rec. S6589 (daily ed. May 18, 1990).

Unquestionably, Congress's intent in enacting § 3196 was to empower the Secretary of State to extradite American citizens when requests were made under extradition treaties that themselves conferred no such authority. But such intent does not reflect a deliberate and impermissible attempt to override or amend these treaties. It is not, after all, any treaty that demands conferral of power before the executive branch surrenders an American national. It is our own constitutional system. In *Valentine,* the Supreme Court expressly stated that, under that system, the power to extradite can be conferred either by legislation *or* by treaty amendment. *Valentine v. United States ex rel. Neidecker,* 299 U.S. at 18, 57 S.Ct. at 106 ("[T]he remedy lies with the Congress, or with the treaty making power...."). Congress simply chose the former option. *Gouveia* does not address the Supreme Court's endorsement of these alternatives, but the rationale for the Court's ruling is clear. Both statutes and treaties are the supreme law of the land. U.S. Const., art. VI, § 2, cl. 2; *Whitney v. Robertson,* 124 U.S. at 194, 8 S.Ct. at 458. Neither is superior to the other. *Whitney v. Robertson,* 124 U.S. at 194, 8 S.Ct. at 458. Thus, either can serve

the Constitution's requirement for a specific legal conferral of the power to extradite.

### E. *Petitioner's Contention that Valentine's Endorsement of Statutory Empowerment Constitutes Dictum*

Hilario submits that, even if empowerment to extradite United States citizens only implicates domestic law, and even if there is no direct conflict between the statute and Article VIII of the Convention, because extradition from the United States is generally conducted only pursuant to treaty, any power to extradite must be conferred in accordance with the treaty making provisions of art. II, § 2, cl. 2 of the Constitution. This argument is, of course, at odds with the repeated statements by the Supreme Court in *Valentine* that the power to extradite United States citizens may be conferred on the executive either by statute or by treaty. Hilario dismisses these statements as *dicta.*

Before addressing petitioner's reading of *Valentine,* the court notes a more fundamental problem with his thesis: there is no authority to support it. Indeed, its foundation will not bear it. The reason the United States grants foreign extradition requests only pursuant to treaty is that Congress has so provided *by statute. See* 18 U.S.C. § 3181 (1985 & Supp.1994); *Gallina v. Fraser,* 177 F.Supp. 856, 862–63 (D.Conn.1959), *aff'd,* 278 F.2d 77 (2d Cir.), *and cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960). Otherwise, it has long been recognized that "Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect." *Grin v. Shine,* 187 U.S. at 191, 23 S.Ct. at 102.

In any event, this court cannot ignore the Supreme Court's plain endorsement of statutory empowerment to extradite in *Valentine.* Petitioner labels this part of the opinion *dictum,* asserting that the only issue actually decided by the Court in *Valentine* was that the extradition treaty with France did not empower any United States official to surrender American citizens. This, however, ignores the fact that the Supreme Court did not begin its search for legal empowerment with the treaty. It first reviewed various federal statutes relating to extradition. *Val-*

*entine v. United States ex rel. Neidecker,* 299 U.S. at 9–10, 57 S.Ct. at 102–03. Only upon finding no statutory conferral of power did the Court state that its focus would necessarily narrow to the extradition treaty. *Id.* at 10, 57 S.Ct. at 103.

There is, in short, no reason in law or logic to disregard that part of the *Valentine* decision authorizing empowerment by statute. Indeed, even if this were *dictum,* when a unanimous Supreme Court repeats it five times in a single opinion, a district court must pay heed.

> [T]he power to provide for extradition is a national power.... But, albeit a national power, it is not confided to the Executive in the absence of treaty *or legislative provision.*

*Id.* at 8, 57 S.Ct. at 102 (emphasis added) (citation omitted).

> "[I]n the absence of a conventional *or legislative provision,* there is no authority vested in any department of the government to seize a fugitive criminal and surrender him to a foreign power."

*Id.* at 9, 57 S.Ct. at 102 (quoting *Moore, supra* ) (emphasis added).

> There is no executive discretion to surrender [a person] to a foreign government, unless that discretion is granted by law. It necessarily follows that as the legal authority does not exist save as it is given *by act of Congress* or by the terms of a treaty, it is not enough that statute or treaty does not deny the power to surrender. It must be found that *statute* or treaty confers the power.

*Id.* (emphasis added).

> [W]e are constrained to hold that [the President's power to extradite] *in the absence of statute conferring an independent power,* must be found in the terms of the treaty.

*Id.* at 18, 57 S.Ct. at 106 (emphasis added).

> However regrettable such a lack of authority may be, the remedy lies *with the Congress,* or with the treaty-making power.

*Id.* (emphasis added).

Because this court finds the enactment of § 3196 consistent with the ruling in *Valen-*

*tine,* and because it finds that the plain language of 18 U.S.C. § 3196 in no way alters or amends Article VIII of the Convention, Hilario's constitutional challenge to the statute must be rejected.

### F. *Petitioner's Challenge to the "Last in Time" Principle of Statutory Construction*

■ Much of petitioner's brief is devoted to attacking the long line of cases holding that, when a treaty and federal statute are so inconsistent as to preclude reconciliation, "the one last in date will control the other." *Whitney v. Robertson,* 124 U.S. at 194, 8 S.Ct. at 458; *accord Moser v. United States,* 341 U.S. at 45, 71 S.Ct. at 555 ("[A] treaty may be modified by a subsequent act of Congress."); *Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. at 160, 54 S.Ct. at 555 (a federal statute in conflict with an earlier treaty "would control in our courts as the later expression of our municipal law"); *Chae Chan Ping v. United States* (the "Chinese Exclusion Case"), 130 U.S. 581, 600, 9 S.Ct. 623, 627, 32 L.Ed. 1068 (1889) (as between a treaty and a federal statute "the last expression of the sovereign will must control"); *Edye v. Robertson* (the "Head Money Cases"), 112 U.S. 580, 599, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884) ("The Constitution gives [a treaty] no superiority over an act of Congress.... [A treaty] is subject to such acts as Congress may pass for its enforcement, modification, or repeal."). Application of the rule to this case would, of course, give preference to § 3196 over any conflicting provision in the Convention.

In support of this argument, petitioner questions the assumption underlying the "last in time" principle, namely that treaties and statutes are equal expressions of law. *See* Louis Henkin, *Foreign Affairs and the Constitution* 164 (2d ed. 1972) ("[O]ne might well have argued ... that a treaty should prevail even in the face of a subsequent statute.... Congress ... probably has a constitutional obligation to implement the treaties which the President and Senate make; it is anomalous to accord it power to disregard a treaty obligation."). He further

endeavors to parse those cases in which the Supreme Court endorses the principle so as to label the rule *dictum.* The fact remains, however, that the Supreme Court has yet to disavow the "last in time" principle. Indeed, legal commentators view the principle as settled: "Whatever the arguments, the equality of statutes and treaties in domestic law seems established, and acts of Congress inconsistent with earlier treaty obligations are regularly given effect by the courts." *Id.;* [4] *accord* Lawrence H. Tribe, *American Constitutional Law* § 4–5, at 226 (2d ed. 1988).

This case does not require this body of law to be revisited for, as already discussed, there simply is no conflict between § 3196 and the Convention. The United States retains the same authority to refuse a request from Portugal for the surrender of an American citizen as it had before enactment of the statute.

## II. *The "Retrospective" Application of Section 3196*

■ In a letter submitted to the court shortly before oral argument, petitioner somewhat obliquely challenges the application of 18 U.S.C. § 3196 to persons such as himself, whose alleged criminal conduct and conviction predate the enactment of the statute. Not insignificantly, this challenge does not invoke the Ex Post Facto Clause, or any other constitutional protection. *See United States ex rel. Oppenheim v. Hecht,* 16 F.2d 955, 956 (2d Cir.) ("Extradition proceedings are not in their nature criminal . . . therefore all talk of ex post facto legislation . . . is quite beside the mark."), *cert. denied,* 273 U.S. 769, 47 S.Ct. 572, 71 L.Ed. 883 (1927); *In re Extradition of McMullen,* 769 F.Supp. 1278, 1290–93 (S.D.N.Y.1991) (rejecting ex post facto challenge to extradition, but granting writ of habeas corpus on bill of attainder grounds), *aff'd, McMullen v. United States,* 953 F.2d 761 (2d Cir.1992), *and aff'd in part, rev'd in part, In re Extradition of McMul-*

*len,* 989 F.2d 603 (2d Cir.) (en banc) (reversal pertains to bill of attainder ruling), *and cert. denied,* —— U.S. ——, 114 S.Ct. 301, 126 L.Ed.2d 249 (1993).

Neither does it take exception to the "long established rule that 'extradition treaties, unless they contain a clause to the contrary, cover offenses committed prior to their conclusion.'" *Galanis v. Pallanck,* 568 F.2d 234, 237 (2d Cir.1977) (quoting *Gallina v. Fraser,* 177 F.Supp. at 864). Indeed, counsel concedes that if the Secretary of State had been granted power to extradite pursuant to treaty rather than statute, Hilario would not challenge his extradition on this ground.

Instead, in a single sentence in the letter, petitioner submits that "while it is clear . . . that a *treaty* may be applied retroactively, there is no authority suggesting that a *statute* may be applied retroactively in this context." (Petitioner's Letter of 5/6/94 at 2.) In fact, petitioner errs in thinking that either an extradition treaty or a statute pertaining to extradition applies retroactively to crimes committed before their enactment.

As the Supreme Court recently stated in *Landgraf v. USI Film Products,* —— U.S. ——, ——, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994), "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment." The key inquiry is whether the law "attaches new legal consequences to events completed before its enactment." *Id.*

Section 3196 attaches no "new legal consequences" to Hilario's 1983 murder of his brother and attempted murder of his son and other brother. These consequences were determined by the courts of Portugal, which ordered Hilario to serve fourteen years in jail for his crimes. All § 3196 does is empower the Secretary of State to surrender Hilario to Portugal so that he may complete this sentence.

---

4. As Professor Henkin explains: "That is not to say, as is often erroneously said, that Congress can 'repeal' a treaty: Congress is not acting upon the treaty, but, exercising one of its legislative powers, it legislates without regard to the international obligations of the United States." Henkin, *supra; see Pigeon River Improvement, Slide &*

*Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. at 160, 54 S.Ct. at 367 (a statute inconsistent with an earlier treaty "would control in our courts as the later expression of our municipal law, even though it conflicted with the provisions of the treaty *and the international obligation remained unaffected* ") (emphasis added).

Neither can petitioner claim that § 3196 attaches new legal consequences to his status in the United States as a fugitive from Portuguese justice. Although it is unclear when such status began, it was not "completed" before the enactment of § 3196. Rather, it continued until 1993, some three years after the statute went into effect.

In any event, over a century ago, Judge (eventually Justice) Blatchford in *In re De Giacomo*, 7 F.Cas. 366 (C.C.S.D.N.Y.1874) (No. 3747), rejected the claim

> that a person who has committed a crime abroad and fled to this country has acquired a right of asylum here, as a personal right, so that, under a subsequent law, *whether treaty or statute,* he cannot be delivered up as a fugitive from justice. If there be any want of power to deliver him up, it must be found in a constitutional restriction upon the power to make a treaty, *or to pass a statute,* covering extradition for a crime previously committed.

*Id.* at 369–70 (emphasis added). In fact, the Constitution does not prohibit laws for the extradition of fugitives from foreign justice, even when such fugitives are United States citizens. *E.g., Charlton v. Kelly,* 229 U.S. at 468, 33 S.Ct. at 952.

*De Giacomo* was relied on by *Gallina v. Fraser,* 177 F.Supp. at 864, the leading case holding that the law relevant to an extradition proceeding is determined with reference to "the time of the demand" for the surrender, not "the time of the commission of the offense." The "law" at issue in *Gallina* was an extradition treaty. But, as the highlighted sections of *De Giacomo* indicate, there is no real distinction to be drawn between treaties and statutes pertaining to extraditions. This is because both serve the same purpose: ensuring that a nation's territory is not "made a place of refuge for criminals." *In re De Giacomo,* 7 F.Cas. at 369. This concern is activated "by the mere fact of finding the fugitive in such territory … without reference to the particular time when the crime was committed." *Id.* The asylum country does not, after all, determine the guilt or innocence of the fugitive. Neither does it fix his punishment. Its sole focus is on the propriety of his surrender. Thus, the law

pertinent to this inquiry, whether reflected in treaty or statute, is determined solely with reference to the time surrender is demanded.

Once again, Hilario cites *Gouveia v. Vokes* to support his retroactivity claim. In *Gouveia,* the court declined to apply § 3196 to a second extradition request because the earlier request, made prior to the statute's enactment, had been denied for lack of executive power to extradite. 800 F.Supp. at 247–49, 259–60. This court expresses no opinion as to the merits of this conclusion on the facts present in *Gouveia.* But certainly this case involves no successive demand for extradition such as was crucial to the *Gouveia* holding.

Because Hilario's surrender was first sought well after the enactment of § 3196, there is no issue of retroactivity in this case.

### Conclusion

Because the Secretary of State is lawfully empowered by 18 U.S.C. § 3196 to extradite United States citizens even absent treaty obligation to do so, and because Hilario raises no other objection to his extradition, this court concludes that petitioner's habeas corpus challenge to Magistrate Judge Caden's order certifying his extraditability is without merit. The petition for a writ of habeas corpus is denied. A certificate of probable cause to appeal is granted.

*SO ORDERED.*