**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Respondent-Appellee*,

v.

IVO KNOTEK,
*Petitioner-Appellant.*

No. 17-55572

D.C. No.
2:16-cv-08299-BRO

OPINION

Appeal from the United States District Court
for the Central District of California
Beverly Reid O'Connell, District Judge, Presiding

Argued and Submitted November 14, 2018
Pasadena, California

Filed June 3, 2019

Before:  Richard A. Paez, Barrington D. Parker,[*]
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Paez

---

[*] The Honorable Barrington D. Parker, United States Circuit Judge for the U.S. Court of Appeals for the Second Circuit, sitting by designation.

## SUMMARY[**]

### Habeas Corpus / Extradition

The panel affirmed the district court's denial of a habeas corpus petition in which Ivo Knotek, a U.S. citizen, challenged an order certifying him as extraditable to the Czech Republic so that he can serve a sentence for a Czech conviction for attempted extortion.

Knotek contended that the government lacks authority to extradite him to the Czech Republic because the extradition treaty between the United States and the Czech Republic ("Treaty") does not provide for the extradition of U.S. citizens, and 18 U.S.C. § 3196 cannot prevail over the Treaty. The panel held that section 3196—which provides that if the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may extradite a United States citizen whose extradition has been requested by a foreign country if the other requirements of that treaty or convention are met— is a permissible act of Congress because it does not amend or conflict with the Treaty.

Knotek argued in the alternative that because the United States and Czech Republic in 2006 made no changes to the Treaty provision regarding extradition of citizens—despite amending analogous clauses in other treaties—this reflects the two countries' intent to prohibit the extradition of their own citizens, and under the "last-in-time" canon, the 2006

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Treaty controls over section 3196, which was enacted in 1990. The panel rejected this contention because it relies on the same flawed assumption—that section 3196 amends or conflicts with the Treaty as enforced in 2006.

The panel held that the Knotek's Czech conviction for attempted extortion qualifies as an extraditable offense because (1) it is an extraditable offense under the Treaty, (2) Knotek's alleged conduct would be punishable in the United States as attempted extortion under 18 U.S.C. § 1951, and (3) attempted extortion in the United States and Czech Republic are substantially analogous and there is dual criminality in Knotek's case.

## COUNSEL

Sonam A. H. Henderson (argued) and Kathryn A. Young, Deputy Federal Public Defenders; Hilary Potashner, Acting Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Respondent-Appellant.

John Joseph Lulejian (argued) and Amanda M. Bettinelli, Assistant United States Attorneys; Lawrence S. Middleton, Chief, Criminal Division; Nicola T. Hanna, United States Attorney; United States Attorney's Office, Los Angeles, California; for Petitioner-Appellee.

**OPINION**

PAEZ, Circuit Judge:

The federal government seeks to extradite a U.S. citizen, Ivo Knotek, to the Czech Republic so that he can serve a sentence for a nearly two-decades-old conviction in that country.  We must decide whether there is legal authority for Knotek's extradition pursuant to 18 U.S.C. § 3196, which addresses extradition of U.S. citizens, and, if so, whether his Czech conviction satisfies the dual criminality requirement.

We agree with the Sixth Circuit and nearly every district court that has considered the applicability of 18 U.S.C. § 3196 that, in the absence of a treaty authorization or prohibition, the statute confers discretion on the U.S. Department of State to seek extradition of U.S. citizens. *See Bašić v. Steck*, 819 F.3d 897, 899–900 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 196 (2016).  We also agree with the district court that Knotek's Czech conviction for attempted extortion qualifies as an extraditable offense and, therefore, affirm the district court's denial of habeas relief.

## I.

## A.

The extradition treaty between the United States and Czech Republic ("Treaty") dates back to 1925, when the former state of Czechoslovakia still existed.  *See* Treaty Concerning the Mutual Extradition of Fugitive Criminals, July 2, 1925, U.S.-Czech., 44 Stat. 2367 (U.S.T. Mar. 29, 1926).  The two countries made minor amendments in 1935, adding more extraditable crimes and offenses.  *See* Supplementary Extradition Treaty, Apr. 29, 1935, U.S.-Czech., 49 Stat. 3253 (U.S.T. Aug. 30, 1935).  In 2006, the

Treaty was amended again along with 21 other bilateral agreements with European Union member states, including the Czech Republic. *See* Extradition Agreement with the European Union, U.S.-E.U., Jun. 25, 2003, S. Treaty Doc. No. 109-14 (2006).

Under Article I of the Treaty, the United States and Czech Republic agree that they "shall," upon request, extradite "any person" found in their respective territories who is charged with or convicted of any crimes or offenses encompassed within the Treaty. Article VIII provides an exception to the general mandate: "neither of the High Contracting Parties shall be bound to deliver up its own citizens."[1]

## B.

Knotek was born in the former Czechoslovakia and, around 1977, he fled his home country to seek refuge on the basis of his anti-Communist political opinion. Knotek was granted refugee status in the United States, and he later naturalized as a U.S. citizen in 1985.

In 1999, while in Prague, Knotek was arrested on allegations that he had attempted to extort representatives from local companies in two separate schemes. In March 2001, the Prague Municipal Court found Knotek guilty of two attempts of criminal extortion in violation of the Czech Criminal Code sections 8(1) and 235(1), and imposed a sentence of five and a half years' imprisonment, "indefinite deportation" from the Czech Republic, and a fine of 250,000

---

[1] This provision is commonly known as a "nationality clause" or "exception clause."

Czech Koruna ("CZK").**2**   On appeal, the High Court of Prague affirmed Knotek's conviction, but reduced his sentence to four years' imprisonment based on the lack of any prior convictions in the country.   In June 2002, the Supreme Court of the Czech Republic rejected Knotek's extraordinary appeal.   By that time, Knotek had left the Czech Republic.**3**

In 2003, following Knotek's failure to pay the court-ordered fine, the Prague Municipal Court increased his sentence to four and a half years' imprisonment.   The court also issued an arrest warrant.   In 2010, the Czech Republic's Ministry of Justice formally contacted the U.S. Department of Justice to request Knotek's extradition.

On August 30, 2013, the U.S. government sought and obtained from the magistrate judge a warrant for Knotek's provisional arrest.   The magistrate judge granted the government's request and issued an order certifying Knotek as extraditable to the Czech Republic.   To challenge the extradition order, Knotek filed a habeas petition in the district court, arguing that 18 U.S.C. § 3196 is an unconstitutional unilateral amendment of the Treaty by the Senate and that his Czech conviction did not fall within the Treaty.**4**   The district court denied the petition, concluding

---

**2** Knotek was convicted along with a co-conspirator, Iva Tat'ounova, who was found guilty of one charge of attempted extortion based on her actions of aiding the first of Knotek's alleged schemes.

**3** The record suggests that Knotek's father died around this time and Knotek needed to travel to make funeral arrangements.

**4** The decision to certify a person as extraditable is not subject to direct appeal but may be challenged collaterally through habeas corpus review. *Prasoprat v. Benov*, 421 F.3d 1009, 1013 (9th Cir. 2005).

that 18 U.S.C. § 3196 is constitutional and that Knotek's attempted extortion conviction falls within the Treaty. Knotek timely appealed.

## II.

As we have stated on many occasions, "[e]xtradition is a matter of foreign policy," a diplomatic process over which the judiciary provides "limited" review. *Vo v. Benov*, 447 F.3d 1235, 1237, 1240 (9th Cir. 2006) (internal citations omitted). "The district court's habeas review of an extradition order is limited to whether: (1) the extradition magistrate [judge] had jurisdiction over the individual sought, (2) the treaty was in force and the accused's alleged offense fell within the treaty's terms, and (3) there is 'any competent evidence' supporting the probable cause determination of the magistrate [judge]." *Santos v. Thomas*, 830 F.3d 987, 1001 (9th Cir. 2016) (en banc) (citations omitted). On review, "we stand in the same position as did the district court." *Id*.

We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. We review de novo the district court's denial of a habeas petition in extradition proceedings. *Prasoprat*, 421 F.3d at 1013; *Santos*, 830 F.3d at 1001.

## III.

Knotek raises two issues on appeal. First, he contends that the government lacks authority to extradite him to the Czech Republic because the Treaty does not provide for the extradition of U.S. citizens and the relevant statute, 18 U.S.C. § 3196, cannot prevail over the Treaty. This is an issue of first impression for our court. Second, Knotek argues that his Czech conviction is not an extraditable offense.

**A.**

Extradition law is generally governed by "a combination of treaty law, federal statutes, and judicial doctrines dating back to the late nineteenth century." *Santos*, 830 F.3d at 990 (citing 18 U.S.C. §§ 3181–3196). The Supreme Court has long recognized that extradition treaties apply equally to U.S. citizens and to noncitizens, and that there is no principle of international law exempting U.S. citizens from extradition *unless* there is a provision to that effect in the relevant treaty. *See Charlton v. Kelly*, 229 U.S. 447, 467 (1913); *see also Neely v. Henkel*, 180 U.S. 109, 123 (1901) (noting that "[U.S.] citizenship does not give [the appellant] an immunity to commit crime in other countries").

The pertinent provision from the Treaty, unchanged since 1925, provides that "[u]nder the stipulations of this Treaty, neither of the High Contracting Parties shall be bound to deliver up its own citizens." The Treaty, however, must be read in conjunction with 18 U.S.C. § 3196, which provides:

> If the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen whose extradition has been requested by that country if the other requirements of that treaty or convention are met.

Knotek argues that section 3196 impermissibly amends the Treaty in violation of Article II of the Constitution, which requires the President's initiation of a treaty or treaty amendment followed by a two-thirds vote of the Senate to

ratify it.**[5]** Alternatively, Knotek argues that the Treaty should prevail over section 3196 and bar his extradition under the "last-in-time" canon of statutory construction. We are not convinced by either argument.

## 1.

All parties agree that, under the Supreme Court's decision in *Valentine v. United States ex rel. Neidecker*, the text of the Treaty—on its own—does not authorize the U.S. and Czech governments to extradite their own citizens. 299 U.S. 5 (1936). In *Valentine*, respondents were native-born U.S. citizens who were charged with committing crimes in France and argued that there was no authority to extradite them to that country. *Id.* at 6. The Court recognized that the power to extradite "is not confided to the Executive in the absence of treaty or legislative provision." *Id.* at 8. Looking to the then-relevant statute, the Court concluded that it did not confer extradition authority where an extradition treaty or convention did not independently provide for it. *Id.* at 9–10. The Court then turned to the U.S.-France extradition treaty, which contained a provision with essentially the same language as the Treaty here.**[6]** *Id.* at 7, 10. On the basis of the treaty's text and a comparison to other treaties with countries like Japan and Mexico, which explicitly conferred discretionary power to surrender U.S. citizens, *id.* at 12–17, the Court concluded that "the President

---

**[5]** The United States Constitution provides that the president "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two-thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2.

**[6]** The U.S.-France treaty stated that "[n]either of the contracting Parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention." *Valentine*, 299 U.S. at 7.

is without power to surrender the respondents" because "the treaty with France fails to grant the necessary authority." *Id*. at 18. In light of *Valentine*, if we were dealing *solely* with the Treaty in this case, the federal government would lack authority to extradite Knotek.

We do not, however, apply the Treaty in isolation. In response to the Court's decision in *Valentine*, Congress considered extradition reform bills in the early 1980s, all of which contained provisions designed to "correct the *Valentine* infirmity." Ethan A. Nadelmann, *The Evolution of United States Involvement in the International Rendition of Fugitive Criminals*, 25 N.Y.U. J. Int'l. L. & Pol. 813, 850 (1993). A bill successfully passed in November 1990 and is now codified at 18 U.S.C. § 3196. *Id*. at 850–51; International Narcotics Control Act of 1990, Pub. L. No. 101-623, 104 Stat. 3350 (1990).

Since its enactment in 1990, there have been several challenges to the constitutionality of section 3196. With the exception of one case, all have ordered extradition under section 3196.[7] *See Bašić*, 819 F.3d at 899–900 (holding that section 3196 is dispositive because it provides for extradition and does not conflict with the U.S.-Bosnia treaty); *Hilario v. United States*, 854 F. Supp. 165, 169–79 (E.D.N.Y. 1994) (same for U.S.-Portugal treaty); *Matter of Extradition of Crismatt*, No. 2:16-MC-29-FTM-CM, 2017 WL 2348714, *3–5 (M.D. Fla. May 30, 2017) (relying on *Bašić* to affirm extradition of U.S. citizen to Panama); *Ravelo Monegro v. Rosa*, No. C98-1414 FMS, 1999 WL 38906, *2 (N.D. Cal.

---

[7] The Second Circuit has not addressed this issue directly, but in *Sacirbey v. Guccione*, the court implied that section 3196 provides authority, but no obligation, to extradite a U.S. citizen to Bosnia. 589 F.3d 52, 69–70 (2d Cir. 2009).

Jan. 28, 1999) (agreeing with reasoning in *Hilario* to affirm petitioners' extradition to the Dominican Republic); *but see Gouveia v. Vokes*, 800 F. Supp. 241, 249–59 (E.D. Penn. 1992) (finding conflict between section 3196 and the U.S.-Portugal extradition treaty). Knotek urges us to adopt the *Gouveia* line of reasoning that section 3196 impermissibly amends the extradition treaty, but those arguments are not supported by the text of the Treaty and statute, or law concerning extradition.

First and foremost, there is no constitutional problem because section 3196 does not amend the terms of the Treaty. Rather, it fills a void. The court in *Hilario* discussed this subtle difference:

> The language of Article VIII reveals a clear but limited purpose. The signatories simply note that their mutual obligation to extradite, undertaken pursuant to Article I, will not apply to requests for the surrender of their own citizens.
>
> …
>
> But an exception clause intended simply to accommodate a signatory's domestic laws cannot be read as the equivalent of a treaty prohibition on a signatory changing its laws to facilitate the extradition of its own nationals.

854 F. Supp. at 169 (citing *Valentine*, 299 U.S. at 11). In other words, the Treaty states that there is no obligation to extradite a U.S. citizen, while section 3196 grants the U.S. government discretion to do so. "[T]here is a vast difference

between not being bound to do an act and being forbidden to do it." *Bašić*, 819 F.3d at 900. Knotek, like the petitioners in *Hilario* and *Bašić*, makes the same fatal mistake in arguing that section 3196 overrides or amends the extradition treaty when in fact "nothing in the language [of the Treaty] prohibits either sovereign from exercising discretion to extradite nationals consistent with its own domestic laws and policies." *Hilario*, 854 F. Supp. at 170.

This reading of the text fits comfortably with long-established law on extradition. As repeated multiple times by the *Valentine* Court, Congress has authority to pass its own laws on extradition outside of treaties. 299 U.S. at 9 ("the legal authority [to extradite] does not exist save as it is given by act of Congress *or* by the terms of a treaty" (emphasis added)). The only reason why the Court had to analyze the U.S.-France treaty in the first place was because the Court found no separate statutory authority. *Id.* at 9–10. Moreover, the Court explicitly invited the government to seek statutory authority from Congress or through the Constitution's treaty-making powers. *Id.* at 18. Since the early twentieth century, "Congress has [had] a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect." *Grin v. Shine*, 187 U.S. 181, 191 (1902). Thus, section 3196 is more properly understood as "fill[ing] a gap in our domestic law" by empowering the Secretary of State to extradite U.S. citizens "as the national interest dictates." *Hilario*, 854 F. Supp. at 170.

A separate long-standing principle supports our understanding of section 3196: that "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." *Pigeon River Imp., Slide & Boom Co. v. Charles W. Cox, Ltd.*, 291 U.S. 138, 160 (1934). "When the [treaty

and statute] relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either." *Whitney v. Robertson*, 124 U.S. 190, 194 (1888). As an example, the Supreme Court applied this principle in *Moser v. United States*, when analyzing the relationship between the U.S. Treaty of 1850 with Switzerland and the 1940 Selective Training and Service Act. 341 U.S. 41 (1951). The former provided an exemption for Swiss citizens from military service in the United States. *Id*. at 45. The latter stated that noncitizens who claimed immunity from service were barred from U.S. citizenship. *Id*. The Court found "nothing inconsistent" between the congressionally imposed limitation on citizenship and the purposes or subject matter of the treaty with Switzerland.**[8]** *Id*.

The same principle applies in Knotek's case because there is no conflict between the Treaty's lack of obligation to extradite U.S. citizens and section 3196's grant of discretion to extradite them. Critically, "[b]oth before and after the enactment of § 3196, the United States retains *complete* discretion under the [Treaty] to refuse a request for the extradition of its citizens." *Hilario*, 854 F. Supp. at 170.

Knotek's challenge relies on the legislative arguments from *Gouveia*. 800 F. Supp. at 249 n.11 (noting that the Senate passed the bill by an unrecorded voice vote, making it impossible to determine the number of Senators who concurred). Citing *Gouveia*, Knotek characterizes section 3196 as an "unprecedented Congressional action" to amend

---

**[8]** The Court also noted that there is no question "that a treaty may be modified by a subsequent act of Congress," but it did not rely on this authority because there was no inconsistency. *Moser*, 341 U.S. at 45 & n. 9.

34 extradition treaties without negotiation by the President with any of those countries or ratification by two-thirds of the Senate. *Id*. at 250. Such a conclusion, however, overlooks the plain language of the relevant text and legal principles discussed above. In other words, Knotek's argument is premised on reading a conflict between the Treaty and statute, where no such conflict exists. We therefore conclude that section 3196 is a permissible act of Congress because section 3196 does not amend or conflict with the Treaty and Congress has authority to adopt domestic laws regulating extradition. *Cf. Valentine*, 299 U.S. at 18.

**2.**

Knotek argues in the alternative that even if section 3196 is constitutional, it does not authorize his extradition based on the "last-in-time" canon of construction. *See Whitney*, 124 U.S. at 194 (noting that when a treaty and statute conflict, "the one last in date will control the other"). He argues that because the United States and Czech Republic made no changes to Article VIII of the Treaty in 2006—despite amending analogous clauses in 13 other pre-*Valentine* treaties—this reflects the two countries' intent to prohibit the extradition of their own citizens. Knotek relies on these other treaty amendments to show that the United States knew how to remedy the *Valentine* problem, but explicitly left Article VIII in place with the Czech Republic.[9]

---

[9] This argument was not relevant in prior cases that addressed this issue because section 3196 presented the "last-in-time" change and, therefore, would have been a stronger argument in support of extradition. *See, e.g.*, *Hilario*, 854 F. Supp. at 174 ("Application of the rule to this case would, of course, give preference to § 3196 over any conflicting provision in the Convention.").

Knotek's argument, however, relies on the same flawed assumption—that section 3196 amends or conflicts with the Treaty as enforced in 2006, when it in fact does not. Moreover, nothing in the record surrounding the Treaty's revisions in 2006 indicates the United States' or Czech Republic's intention, one way or another, in keeping the language of Article VIII. Rather, the Senate Executive Report, "Extradition Treaties with the European Union," indicates that the parties' concerns were to incorporate modern dual-criminality provisions, streamline the authentication and transmission of extradition documents, provide for temporary transfers, incorporate assurances against the use of the death penalty, and simplify the extradition process.

It would be a different situation if the United States and Czech Republic had explicitly amended Article VIII to prohibit the extradition of their own citizens. This would render section 3196 inapplicable because the statute confers authority only "[i]f the applicable treaty or convention *does not obligate* the United States to extradite its citizens to a foreign country." 18 U.S.C. § 3196 (emphasis added). Without such an explicit prohibition in the Treaty, however, the "last-in-time" canon does not change our conclusion that section 3196 authorizes Knotek's extradition.

**B.**

The question of whether an offense is extraditable involves determining: (1) whether it is listed as an extraditable crime in the relevant treaty; (2) whether the alleged conduct is criminalized in both countries[10]; and,

---

[10] In assessing dual criminality, we look first for a similar criminal provision of federal law or, if none, the law of the place where the

(3) whether the offenses in both countries are substantially analogous. *See Quinn v. Robinson*, 783 F.2d 776, 783, 791 (9th Cir. 1986); *see also Wright v. Henkel*, 190 U.S. 40, 58 (1903). These are purely legal questions that we review de novo. *Quinn*, 783 F.2d at 791. Knotek's Czech conviction satisfies all three elements of the test.

**1.**

The 2006 amendments to the Treaty make any offense extraditable "if it is punishable under the laws of the Requesting and Requested States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." Article II also covers any "attempt or conspiracy to commit, or participation in the commission of, an extraditable" offense. Knotek was convicted of attempted extortion and sentenced to four and a half years of imprisonment under Czech Criminal Code section 235(3) for causing "extensive damage" of at least five million CZK. The U.S. federal counterpart for criminal extortion, 18 U.S.C. § 1951, carries a maximum sentence of 20 years' imprisonment. *Id*. at 1951(a). Thus, Knotek's Czech conviction would fall within the Treaty as an extraditable offense if the other two elements are met.

**2.**

We next turn to whether Knotek's conduct would be punishable in the United States as attempted extortion under 18 U.S.C. § 1951.[11] This is a fact-based inquiry into the

_____

individual was found or, if none, the law of the preponderance of the states. *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981).

[11] Because there is a federal criminal provision similar to the Czech provision for criminal extortion, we need not look to the law of

conduct alleged in the documents filed by the Czech officials, through the U.S. government, in support of the extradition request. *See, e.g.*, *Matter of Extradition of Russell*, 789 F.2d 801, 803–04 (9th Cir. 1986). The documents submitted with the extradition request included: the decisions of the Prague Municipal Court, High Court of Prague, and Supreme Court of the Czech Republic; the 2003 sentencing order by the Prague Municipal Court; and, the 2004 arrest warrant for Knotek. These supporting documents confirm that Knotek was convicted of attempting to extort representatives from two companies, Teleaxis Praha ("Teleaxis") and Eurotel Praha ("Eurotel"), in two separate schemes throughout 1999.

First, the Czech courts concluded that Knotek, along with co-conspirator Tat'ounova, had threatened to interfere with an advertising contract between Teleaxis and Eurotel. Tat'ounova was at the time director of the press department of Eurotel. Over four months, Knotek repeatedly communicated with a Teleaxis representative, Peter Kovarcik, demanding to be paid a commission of 2.5 million CZK or he would otherwise use his influence with Eurotel to prevent that contract from being signed. Through Tat'ounova, Knotek obtained Teleaxis' official copy of the signed contract, thereby holding up the payment of a third invoice owed to Teleaxis. Tat'ounova repeatedly obstructed officials from the companies from meeting to discuss the withheld invoice and contract. When they were finally able

California, the state where Knotek was arrested. *See Cucuzzella*, 638 F.2d at 107. Practically speaking, it makes no difference to our analysis whether we apply federal or California law because "the elements of extortion under federal and California law are substantially the same." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1133 (9th Cir. 2014) (comparing 18 U.S.C. § 1951(b)(2) with Cal. Penal Code § 518(a)).

to meet, the CEO of Eurotel, Edward Rockwell Kingman, received an inflammatory text message from Knotek attempting to discredit the Teleaxis representative, Kovarcik. Tat'ounova was promptly fired based on her relationship with Knotek.

The Czech courts also concluded that in a second scheme, Knotek had threatened the CEO of Eurotel, Kingman, to go public about a Eurotel product failure in exchange for a pay-off. Kingman reported the situation to the company's board of directors and eventually contacted the police, who obtained recordings of meetings between Knotek and Kingman during which Knotek demanded, in exchange for his information, at least $50,000 USD and an increase in contracts with a separate company in which he had interest. Shortly thereafter, Kingman lodged a criminal complaint against Knotek, who was taken into custody and eventually convicted of criminal extortion.

Knotek argues that the conduct underlying his 2001 Czech conviction for both schemes cannot be characterized as criminal but, rather, tortious because the tactics he used qualified as "hard bargaining" at most and, therefore, do not support an extortion charge under U.S. federal law. It is true that extortion is more broadly defined under Czech law than U.S. federal law. Under Czech Criminal Code 235(1), extortion is defined as when a person "forces another to do something, not to do something or to tolerate something by violence, the threat of violence or threat of other grave harm." Conversely, criminal extortion in the United States is defined as "the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added).

The United States recognizes a "claim of right" defense against economic fear-based extortion claims. *United States v. Enmons*, 410 U.S. 396, 399–400 (1973). That means nonviolent threats of economic harm made to obtain property from another are not generally considered "wrongful" when "the alleged extortioner has a legitimate claim to the property obtained through such threats." *Levitt*, 765 F.3d at 1130, 1134 (citations omitted) (holding that business owners failed to sufficiently allege that Yelp *wrongfully* threatened economic loss because Yelp had the right to charge them for legitimate advertising services). On the other hand, "using fear of economic loss to obtain personal payoffs or payments for 'imposed, unwanted, superfluous and fictitious services,' may well be extortionate." *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Constr. Trades Dep't, AFL-CIO*, 770 F.3d 834, 838 (9th Cir. 2014) (citing *Enmons*, 410 U.S. at 400); *United States v. Vigil*, 523 F.3d 1258, 1265 (9th Cir. 2008)). In short, an individual may be convicted of extortion or attempted extortion if the means used are inherently wrongful under the circumstances or if the individual has no lawful claim to the property demanded. *See United States v. Villalobos*, 748 F.3d 953, 956–57 (9th Cir. 2014).

On the basis of the evidence presented in the Czech court documents, Knotek's assertions that his conduct was not "wrongful" are unavailing. With regard to the advertising contract between Eurotel and Teleaxis, Knotek insists that he believed he was entitled to the commission for negotiating the contract. This does not explain, however, why after the contract was finalized, Knotek helped his co-conspirator withhold a copy of the contract from Teleaxis and block Eurotel's payment of Teleaxis's third invoice. This conduct evinces an intent beyond simply hard bargaining. *See, e.g.*, *Villalobos*, 748 F.3d at 957–58

(concluding that the jury could have found the defendant guilty because the means used to obtain the property were unlawful and clearly wrongful under the circumstances). As for the second scheme, Knotek argues that he had the right to go to the press with the story and that his actions were in the context of contract negotiations. This overlooks the evidence from Eurotel's CEO and other witnesses, including a video recording of Knotek's actions, that show that his offered services were "imposed" and "unwanted," rather than "genuine services" which the company sought. *Enmons*, 410 U.S. at 400. Knotek has not shown that he had a lawful claim to the property demanded. *See Villalobos*, 748 F.3d at 956–57.

Lastly, Knotek argues that any fear induced in the victims must have been reasonable to be punishable under 18 U.S.C. § 1951, and neither Teleaxis's nor Eurotel's fears were reasonable under the circumstances. While that is the case for completed acts of extortion, the victim's state of mind is not relevant for *attempted* extortion. *United States v. Marsh*, 26 F.3d 1496, 1500–01 (9th Cir. 1994). "What is important is that the defendant attempted to instill fear in the victim." *Id*. at 1501 (quoting *United States v. Ward*, 914 F.2d 1340, 1347 (9th Cir. 1990)). Based on the documents presented with the extradition request, a reasonable factfinder could infer an intent to instill fear in the representatives of Teleaxis and Eurotel. *Accord Manta v. Chertoff*, 518 F.3d 1134, 1142 (9th Cir. 2008) (concluding that alleged conduct evinced a specific intent to defraud based on the circumstantial evidence provided). We therefore conclude that Knotek's alleged conduct would be punishable as attempted extortion in the United States.

**3.**

For two offenses to be substantially analogous, the court looks at whether "[t]he essential character of the transaction is the same, and made criminal by both statutes." *Wright*, 190 U.S. at 58. There is no need for the scope of criminal liability to be coextensive or the same in both the United States and requesting country. *See Collins v. Loisel*, 259 U.S. 309, 312 (1922) (holding there was dual criminality where petitioner was accused of obtaining jewelry by false pretenses, which qualified as cheating in India and obtaining property under false pretenses in the United States). Rather, "[i]t is enough if the particular act charged is criminal in both jurisdictions." *Id.* The elements of one offense "need not be identical to the elements of a similar offense in the United States."[12] *Russell*, 789 F.2d at 803. Even the names of the offenses need not match. *Emami v. U.S. Dist. Court for N. Dist. of Cal.*, 834 F.2d 1444, 1450 (9th Cir. 1987) (holding that German crime of fraud was substantially analogous to U.S. mail and Social Security fraud). It is immaterial whether one country's law is broader than the other, *Clarey v. Gregg*, 138 F.3d 764, 765–66 (9th Cir. 1998) (comparing simple homicide in Mexico and felony murder in the U.S.), so long as "the essential character of the acts criminalized is the same." *Oen Yin-Choy v. Robinson,* 858 F.2d 1400, 1404–05 & n.2 (9th Cir. 1988) (finding dual criminality where petitioner was charged with Hong Kong crimes of false accounting and publishing a false statement because

---

[12] The 2006 amendments to the Treaty incorporated this relaxed rule under Article II: "For purposes of this Article, a crime or offense shall be considered an extraditable crime or offense: (a) regardless of whether the laws in the Requesting and Requested States place the crime or offense within the same category of crimes or offenses or describe the crime or offense by the same terminology."

they were analogous to U.S. federal crime of making a false entry in a bank statement (citation omitted)).

Applying these rules of construction, many courts have found two crimes to be substantially analogous despite differences in their required elements. *See, e.g.*, *Kelly v. Griffin*, 241 U.S. 6, 13–14 (1916) (holding that perjury in United States and Canada are substantially analogous even though Canada's criminal code does not require that perjured statements be material); *Russell*, 789 F.2d at 803 (same for conspiracy in United States and Australia, even though latter did not require overt acts); *Man-Seok Choe v. Torres*, 525 F.3d 733, 737–38 (9th Cir. 2008) (same for bribery in South Korea and United States, even though the former is broader and criminalizes conduct that would be considered "mere lobbying"); *but see United States v. Khan,* 993 F.2d 1368, 1372–73 (9th Cir. 1993) (holding that no Pakistani law was sufficiently analogous to U.S. crime of using a phone to facilitate a drug offense).

To whatever extent Knotek argues that attempted extortion in the Czech Republic is not analogous to its U.S. counterpart because the former does not include a wrongfulness element, the case law quickly disproves that distinction. The fact that one country's law is broader "is of no consequence." *Man-Seok Choe*, 525 F.3d at 738. What matters is that the two country's laws are "directed to the same basic evil." *Id.* (quoting *Clarey v. Gregg*, 138 F.3d 764, 766 (9th Cir. 1998)). In this case, the "same basic evil" is the unwarranted use of threatening tactics for economic gain. Thus, we conclude that attempted extortion in the United States and Czech Republic are substantially analogous and there is dual criminality in Knotek's case.

## IV.

In affirming Knotek's extradition order, we do recognize the impact this decision has, uprooting a 62-year-old U.S. citizen to serve a four-and-a-half year sentence for an economic crime committed two decades ago. There is no explanation in the record as to why the extradition process has taken so long or why the U.S. government believes the national interest "dictates" exercise of discretion under section 3196 to extradite Knotek. *See Hilario*, 854 F. Supp. at 170. As we have emphasized before, however, "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch" and the "extradition court . . . exercises very limited authority in the overall process of extradition." *Vo*, 447 F.3d at 1237 (citing *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir. 1997); *In re Metzger*, 46 U.S. (5 How.) 176, 188 (1847)). For the above reasons, we affirm the district court's judgment in all aspects.

**AFFIRMED.**